

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

ADAM B. HELLER,                                    ECF Case

               Plaintiff,                      Civil Action No.

   -against-

BEDFORD CENTRAL SCHOOL DISTRICT,
DR. JERE HOCHMAN; TOWN OF POUND RIDGE;        **COMPLAINT**
DAVID RYAN; WESTCHESTER MEDICAL
CENTER; SUSAN KEMKER, M.D.; and               **JURY TRIAL**
ALEXANDER LERMAN, M.D.,                        **DEMANDED**

              Defendants.        **15 CV    0705**

-------------------------------------------------------------------x

    By and through his counsel, SUSSMAN AND WATKINS, plaintiff ADAM B. HELLER,

for his Complaint, alleges as follows:

### NATURE OF ACTION

   1. Plaintiff ADAM B. HELLER brings this action under 42 U.S.C. § 1983 to redress violations

of his First, Second, Fourth and Fourteenth Amendment rights arising from his false arrest,

wrongful involuntary commitment, loss of employment as a tenured high school English teacher,

confiscation of his legally-acquired firearms and chilling of his protected speech.

   2. In January 2013, law enforcement targeted Mr. Heller for investigation on the basis of his

protected speech and lawful firearms purchases and, on those same bases, arrested him, unlawfully

detained him for five days and then coerced and conspired with hospital officials to involuntarily

commit him to a psychiatric hospital for seven more days despite the fact that he then neither

suffered, nor appeared to suffer, from any mental illness nor presented any level of risk of

substantial harm to himself or others.

1

3. Thereafter, on the basis of the same protected activity underlying his wrongful arrest and involuntary commitment, Mr. Heller's employer, defendant Bedford Central School District, directed him to undergo a psychiatric evaluation and propounded baseless disciplinary charges against him, which were sustained by a hearing officer and resulted in the termination of his employment as tenured high school English teacher.

## PARTIES

4. Petitioner ADAM B. HELLER is a thirty-six year old male residing in the Town of Pound Ridge, County of Westchester, State of New York.

5. Defendant BEDFORD CENTRAL SCHOOL DISTRICT (the "District" or "BCSD") is a municipal corporation duly established and existing pursuant to the laws of the State of New York. It is located in the County of Westchester, State of New York and is comprised of five elementary schools, one middle school and one high school, superintended by Dr. Jere Hochman and governed by a seven-member Board of Education.  It may sue and be sued.

6. Defendant DR. JERE HOCHMAN is an individual of legal age residing in the State of New York.  At all relevant times he was the Superintendent of Schools of the District.

7. Defendant TOWN OF POUND RIDGE is a municipal corporation duly established and existing pursuant to the laws of the State of New York.  It is located in the County of Westchester, State of New York and may sue and be sued.

8. Defendant DAVID RYAN is an individual of legal age residing in the State of New York. At all relevant times he was the Chief of Police of the Town of Pound Ridge Police Department.

9. Defendant WESTCHESTER MEDICAL CENTER is a not-for-profit corporation duly established and existing pursuant to the laws of the State of New York.  It is located in the County of Westchester, State of New York and may sue and be sued.

2

10. Defendant SUSAN KEMKER, M.D. is an individual of legal age residing in the State of New York. She is licensed by the State of New York to practice medicine and, at all relevant times, was employed by defendant Westchester Medical Center and acting under color of state law.

11. Defendant ALEXANDER LERMAN, M.D. is an individual of legal age residing in the State of New York. He is licensed by the State of New York to practice medicine.

## JURISDICTION AND VENUE

12. As this action seeks to redress violations of Mr. Heller's federal constitutional rights, this Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.

13. The state claims asserted herein are so related to the federal claims that they form part of the same case or controversy and, thus, this Honorable Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a).

14. A substantial part of the events giving rise to Mr. Heller's claims herein occurred in the County of Westchester, State of New York, which is within the boundaries of the Southern District of New York and, thus, venue in this Honorable Court is appropriate under 28 U.S.C. § 1391(b)(2).

## GENERAL FACTUAL ALLEGATIONS

### A. Background.

15. Mr. Heller is thirty-six years old and grew up in Goshen, New York with his parents, Gary and Lois Heller, and a younger sister, Rachel.

16. Growing up, Heller's father was an assistant principal, and then principal, for many years at Monroe-Woodbury High School and Suffern High School and was also an Assistant Superintendent for many years; he has since retired.

3

17. Heller's mother was a high school music teacher at Warwick High School and also worked at an elementary school in Middletown and is also now retired.

18. Heller attended the State University of New York at Binghamton, where he majored in English Literature and graduated in 2001 with his Bachelor's Degree.

19. After college, Heller entered the New York City Teaching Fellowship, where he taught tenth, eleventh and twelfth grade English at Harry S. Truman High School for two years.

20. While teaching at Truman High School, Heller earned his Master's Degree in Education from Lehman College.

21. After completing his Fellowship, Heller was hired by the District as a high school English teacher at its Fox Lane High School and commenced employment in that capacity.

22. Heller earned tenure in 2005.

23. During his employment with the District, and with the District's support, Heller pursued and obtained a second Master's Degree in Consciousness Studies from the Graduate Institute of Connecticut.

24. At Fox Lane, Heller taught approximately five classes each semester with about twenty-five to thirty students in each class, putting him in direct contact with about 125 to 150 students each semester.

25. During the entirety of his employment with the District, and prior to the disciplinary charges which give rise to this action, Heller was never disciplined.

26. During the entirety of his employment with the District, school authorities received no formal complaints about Heller from any student, parent, faculty or administrator.

27. During the entirety of his employment with the District, Heller received high marks on his annual evaluations and was regarded by his students, colleagues and administrators as an excellent and effective teacher.

**B. Heller legally acquires firearms.**

28. In December 2012, Heller, who had participated in marksmanship activities as a child in the Boy Scouts and had recently visited the Western United States and observed the firearm culture in that part of the country, decided to purchase a firearm.

29. On December 13, 2012, Heller visited Precision Armory, a retail seller of firearms in Putnam County, New York.

30. He did not know which firearm to purchase and learned from an employee of the store that most people purchase a shotgun as a first firearm.

31. He found a shotgun he thought looked nice and fit his price range; the employee told him it was designed for skeet-shooting.

32. Heller completed all necessary paperwork and legally acquired the firearm – a Winchester Model 1300 12-gauge pump action shotgun.

33. Prior to this purchase, Heller had never purchased or owned a firearm and was not intimately familiar with firearms, including the model he had just purchased.

34. The next day, on December 14, 2012, Heller returned to Precision Armory to shop for another firearm and discovered an interesting Russian rifle from World War II – Mosin Nagant bolt action rifle – which he thought was a nice historical piece.

35. He completed all necessary paperwork and legally acquired the Mosin rifle.

36. A couple of weeks after purchasing his first two firearms, a friend gave Heller a .22 caliber rifle.

37.  Heller never fired the shotgun or the Mosin and, while firing the .22 caliber rifle at a target, discovered the firearm was broken.

38.  Heller never brought any of these firearms to school and never intended to do so.

39.  In early January 2013, Mr. Heller became interested in purchasing a Ruger 10/22 .22 caliber rifle as a survivalist tool in the event of a major catastrophe, but he never purchased the firearm.

40. Mr. Heller's motivations for acquiring firearms in December 2012 and continued interest in firearms in January 2013 were multiple and included, *inter alia*: (1) his desire to get back into marksmanship/sporting activities he had engaged in as a child in the Boy Scouts; (2) his observation of the culture of firearms in the Western part of the country and realization of his right to own firearms in that regard; (3) his desire to take symbolic action in support of the Second Amendment; (4) his concern, in the wake of the December 2012 school-shooting tragedy in Newtown, Connecticut, that stricter gun control laws might prevent him from acquiring firearms in the future; and (5) his realization, after having read a local newspaper article, that a large portion of the surrounding population owned firearms.

## C.  Heller's private online chat communications.

41.  In December 2012 Heller began instant messaging with Georgia O'Connor, a friend whom he met through his parents.  Ms. O'Connor is a medium (one who communicates with spirits) by profession.

42.  Their instant messaging occurred in the context of playing Words with Friends, an online Scrabble game with a private instant messaging feature that allows players to communicate directly to and with each other.

43. These chat logs are not able to be viewed by other users of the Words with Friends site, but only by those directly engaged in the communication.

44. Accordingly, only Heller and Ms. O'Connor were able to view the contents of the chat communication and the same was not able to be viewed by others and was not otherwise published for public view by either participant or otherwise.

45. During the course of about a month – from on or about December 7, 2012 to on or about January 10, 2013 – Heller and Ms. O'Connor discussed several topics, ranging from the banal occurrences of daily life (e.g., work, family) to controversial political subjects.

46. During these private one-on-one conversations, Heller explained to Ms. O'Connor his concerns about governmental power and corruption, including the potential misuse by the government of technology to affect weather patterns and its involvement in nation-wide conspiracies, including, potentially, the then-recent school shooting tragedy in Newtown, Connecticut, which occurred on December 14, 2012.

47. Heller also shared his concerns about the nation's economy and fear of its potential collapse.

48. During these communications, Heller never threatened any person; nor during the time frame covered by these communications or otherwise did Heller ever take any illegal action associated with any of his thoughts or musings.

**D. The police investigation.**

49. On or about January 8, 2013, the FBI contacted Bedford Police Chief William Hayes claiming that a female friend of Heller's called with concerns about Heller's well-being.

50. The alleged informant has never been identified.

51. Upon information and belief, there was no informant and, instead, Mr. Heller was targeted for investigation by the FBI as a result of, *inter alia*, its surveillance of his private online communications. Information and belief is based upon the fact that (1) the FBI's initial concern and the subsequent investigation focused on specific things Heller wrote in his private chat communications with Ms. O'Connor, which were not made public and were known only to Heller and Ms. O'Connor; (2) Ms. O'Connor disclaims having contacted the FBI or any other law enforcement agency about Heller; (3) the alleged informant has never been identified; and (4) only two parties, neither of whom disclosed the content of the communications, were involved in them or had access to them.

52. Hayes, whose department has jurisdiction over Heller's then-workplace, immediately contacted Pound Ridge Police Chief David Ryan, whose agency has jurisdiction over Heller's residence.

53. Members of the various law enforcement agencies, including several FBI special agents, Chief Hayes, Chief Ryan and other members of the Bedford and Pound Ridge police departments met on or about January 8, 2013 for a briefing.

54. Law enforcement officials contacted District Superintendent Dr. Jere Hochman and included him in their briefings.

55. Thereafter, local law enforcement commenced an investigation, monitoring Heller's online communications and activities and maintaining heightened vigilance at Fox Lane High School where he taught.

56. During the course of the investigation, law enforcement learned that Heller had committed no crimes, had no history of violence or any criminal activity and had no prior contact with any of the local police agencies involved.

8

57. Police also learned that Heller had no enemies in the District and that nobody in the District, including Hochman, had any concerns about Heller, who had been employed there and well-known to and liked by administrators, faculty, parents and students for over a decade.

58. Just ten days later, on January 18, 2013, though Heller had concededly committed no crime and law enforcement learned nothing in its investigation that would lead it to objectively believe that he might commit a crime or that he posed any kind of danger to anyone, Chief Ryan determined that his agency would make contact with Heller when he was on his way home from work that day and effect a mental health arrest.

59. When Ryan made this decision, neither he nor any other law enforcement officer had any reasonable, factual basis to believe that Heller was or appeared mentally ill or presented a threat of harm, let alone serious harm or danger, to himself or others.

60. As Heller left work that day, the police trailed him.

61. Instead of immediately returning home from work, Heller returned to Precision Armory to look into purchasing the .22 caliber rifle he had been researching – a Ruger 10/22.

62. In early January 2013, Mr. Heller became interested in purchasing the Ruger 10/22 because he accepted the common view that it would be an ideal survivalist tool in the event of a major catastrophe.

63. In fact, the Ruger 10/22 is one of the most popular .22 caliber firearms on the market, has been in production for decades and is still in production.

64. Many people learn how to shoot with the Ruger 10/22 as it is a well-manufactured and reliable firearm.

65. Moreover, the Ruger 10/22 is ideal for target shooting and small game only and, in fact, it is illegal for use in hunting large game because it would wound large animals and cause them to suffer a lengthy and painful death.

66. It is for this reason that, upon information and belief, .22 caliber firearms have not been used in any of the recently publicized mass shootings, thus rendering law enforcement's purported concern over Heller's interest in purchasing such a firearm that much less credible or compelling.

67. Similarly, law enforcement's purported concern over Heller's purchase of the Mosin is rendered less credible and compelling by the fact that the Mosin's bolt action and significant age significantly diminish its functionality in a potential mass shooting scenario.

68. When he inquired about the firearm, the salesperson told Heller the firearm would likely soon be illegal because it had a ten round magazine, but that he could then legally purchase it.

69. Based on the salesperson's indication that the firearm might soon become illegal, Heller decided against purchasing it.

70. Having made no purchase, Heller left the store to go home.

71. At no point in time did any law enforcement officer enter the store while Heller was inside or speak or otherwise make contact with Heller.

**E.  The mental health arrest.**

72. On his way home, about a mile or so after exiting the highway, Heller was pulled over by multiple marked and unmarked police vehicles, including one from the Town of Pound Ridge Police Department.

73. Chief Ryan approached Heller's car and told him, in sum and substance: We know you don't understand what's going on right now, but I need you to cooperate because I'm the only friend you have right now.

10

74. Ryan also advised Heller that if he did not cooperate with law enforcement, his job and community standing would be jeopardized and, in any event, that he would be compelled by law enforcement to comply.

75. Ryan asked Heller if he had any weapons and Heller truthfully responded he owned firearms, which were maintained at his home.

76. Upon Ryan's request, Heller permitted the police to search his car.

77. Ryan then asked Heller to exit the car and Heller complied.

78. After the police frisked Heller and searched his car, Ryan asked if they could go to Heller's house to talk and Heller agreed.

79. Approximately eight law enforcement personnel then drove to Heller's home.

80. Heller and Ryan entered the house, sat in the living room and started to talk.

81. As the two began their conversation, Ryan sent officers upstairs to "secure" Heller's firearms.

82. The police confiscated Heller's firearms.

83. Ryan later reported to NICS that Heller had been involuntary committed to a psychiatric facility and, as a result, Heller may never again legally acquire firearms.

84. Heller did not consent to a search of his house and the police had no warrant permitting them to search his house.

85. Despite lacking consent or a warrant to search Heller's house, and no exigencies or any other circumstances that might authorize a warrantless search existing, the police searched Heller's house – they went through his dresser drawers in all of his rooms, searched through boxes, opened letters and envelopes, ransacked his closet and opened kitchen drawers.

86. While in Heller's bedroom, police found tobacco and salt in his dresser and falsely reported to the hospital that they had found marijuana and a "white crystalline" substance they suspected to be an illicit drug such as methamphetamine or cocaine.

87. The police did not confiscate or test these substances and never charged Heller with any drug-related offense.

88. Ryan told Heller of the alleged FBI informant and their concern about his recent behaviors – e.g., his internet writings, that he had stopped going to the gym three years prior and that he was becoming less social at school.

89. Ryan asked Heller about his relationship with his family, whether he was suicidal, whether he had recently changed his habits and whether he was recently sick.

90. Heller was calm, friendly and receptive, answered all of Ryan's questions fully and cooperated with the interrogation.

91. He told Ryan that his family was not particularly close and that he was not suicidal.

92. Ryan told Heller that he wanted Heller to go with him to the hospital for an evaluation.

93. Ryan insisted, "I think that it's best for your job and it's best for your standing in the community" if Heller cooperated and went for an evaluation.

94. Ryan also told Heller that, if he did not agree to go voluntarily for the evaluation, Ryan had authority to compel him to go involuntarily and would do so.

95. Though he did not want to go and did not believe he needed an evaluation, Heller reluctantly agreed to go based upon Ryan's representation and threat of involuntary compulsion which Ryan articulated.

96. At the time Ryan compelled Heller to go for a mental health evaluation, he did not have any reasonable factual basis to believe that Heller was mentally ill or presented any risk of serious harm to himself or others.

### F. Heller is held at WMC.

97. Heller travelled with Ryan in an unmarked car to Westchester Medical Center ("WMC") in Valhalla, New York and, upon arrival, was brought to the Behavioral Health Unit.

98. As Heller waited to be seen, Chief Ryan spoke with the doctors and hospital staff for about an hour.

99. Upon information and belief, as evidenced by Heller's medical records from WMC, Ryan and other law enforcement officers told doctors at WMC, among other inflammatory and false information, that Heller had purchased several firearms that day, had made public threats about killing others and had admitted to being severely depressed and suicidal.

100. This information was materially false since Heller had not purchased any firearms that day, had never made any threats [public or private] about killing others and explicitly denied being depressed or suicidal.

101. Upon information and belief, Ryan also informed doctors that Heller had written about suicidal and homicidal thoughts in his personal journals, which police had found in his car, confiscated and turned over to the doctors.

102. But Ryan spent no more than 15 seconds flipping through these journals and did not know what information was contained therein.

103. In fact, there are no such references in Heller's journals, and so Ryan's account to the doctors was materially false.

104. The fact that Ryan's account to the doctors was substantially false is also supported by Heller's medical records which, aside from Ryan's mischaracterization of Heller's journals, contain no reference to any specific writings in those journals and which also include the observation of Heller's discharging doctor that he had reviewed the journals and saw nothing troubling therein.

105. By repeating such baseless and inciting statements, as evidenced by Heller's medical records from WMC, Ryan sought to persuade the doctors with whom he spoke that Heller needed to be involuntarily committed and, in fact, demanded that they do so.

106. After Ryan so spoke with WMC personnel, Heller was interviewed for about 40 minutes by a case manager, Sorin Saladie, who did not illuminate why Heller was there.

107. Before the doctors could continue with the psychiatric evaluation processes, they took Heller for a medical evaluation and determined that his pulse was high and he needed to be admitted to the medical emergency room.

108. Initially, Heller resisted because he felt fine, but Ryan and Saladie advised Heller that if he did not cooperate and agree to be admitted, such non-cooperation would be used against him and likely would have negative implications for his job.

109. Persuaded by Ryan's and Saladie's threats to his job and livelihood, Heller agreed and was placed in an ambulance and brought to the medical ER.

110. Upon arriving at the ER, the doctors diagnosed Heller with tachycardia, which is a fast pulse, started an IV and gave him medication to treat the condition.

111. Heller initially refused medication and reluctantly acquiesced under duress only after the doctors brought Ryan into the room to help them persuade Heller to accept their treatment and

14

Ryan, again, convinced Heller that his non-cooperation would be used against him and likely result in the loss of his job.

112. That evening, and despite the facts that he exhibited no signs of anxiety or aggression and was not in any need of sedation, Heller was administered two doses of Ativan.

113. The Ativan had an intoxicating effect on Heller.

114. After Heller was admitted and medicated, Chief Ryan came to Heller's room to speak with him.

115. While Heller was under the intoxicating effect of two doses of Ativan, Ryan coerced Heller to sign a HIPAA release, authorizing the doctors to speak with Ryan and to provide him with Heller's medical records.

116. Ryan also told Heller that he was not permitted to leave and warned that if he tried to leave he would be arrested and brought back to the hospital.

117. Consistent with his threat to Heller, Ryan stationed two armed, uniformed police officers outside his room for the first two nights of Heller's stay (1/18/2013 and 1/19/2013) to prevent him from leaving.

118. In addition to the police presence, the hospital provided staff as protective assistants ("PA") and stationed them in Heller's room for the duration of his admission to the hospital's medical service (1/18/2103 to 1/23/2013) to prevent him from leaving.

119. Heller did not wish to remain in the hospital and wanted to leave right away; however he was unable to leave because of Ryan's threat and the presence of the police and PAs prohibiting him from leaving and, as such, he remained admitted to the hospital's medical service against his will from January 18, 2013 through January 23, 2013.

### G. Heller is involuntarily committed to WMC.

120. On January 23, 2013, Heller was transferred to the Behavioral Health Unit.

121. At the time of this transfer, Heller did not, by reason of any mental illness or otherwise, present a substantial risk of physical harm to himself or others.

122. Upon his arrival, defendant Susan Kemker, M.D. completed an evaluation of Heller and, despite that fact that Heller did not present a substantial risk of physical harm to himself or others, signed a certification causing his involuntary commitment.

123. In doing so, Kemker spent very little time actually speaking to Mr. Heller and, instead, her evaluation consisted primarily of her review of prior notes from Mr. Heller's initial admission to the hospital's medical service, conversations with his family members and conversations with law enforcement personnel.

124. Dr. Kemker's decision to involuntarily commit Mr. Heller was significantly influenced and encouraged by law enforcement, including defendant Ryan.

125. Dr. Kemker's decision to involuntarily commit Mr. Heller was not made in accordance with generally accepted medical standards because, *inter alia*, she failed to conduct an adequate examination of him, failed to identify, evaluate and weigh known risk factors for dangerousness to self and others in the context of Heller's presentation and ignored the fact that the evidence presented to her could not reasonably support the conclusion that Heller presented a substantial risk of physical harm to himself or others – because he did not present any such risk – and that no reasonable physician acting in accordance with generally accepted medical standards could have concluded otherwise.

126. Despite his desire to go home and the fact the he did not present a substantial risk of physical harm to himself or others, Heller was involuntarily committed and, during the following week, was seen by many doctors, including Dr. Mitchell Nobler.

127. Finally, by January 30, 2013, a number of doctors had evaluated Heller, including Dr. Nobler, who met with Heller for about an hour and, ultimately, signed off on his discharge that day, providing him with a letter clearing him to return to work.

128. As reflected in his discharge note, Dr. Nobler's decision to discharge Heller and clear him to return work was based upon, *inter alia*, his evaluation and treatment of him over the course of the prior week, his review of all of the medical records, his conversation with Chief Ryan and his ultimate conclusion that Heller did not present any risk of harm to himself or others.

129. After his discharge, Heller emailed Superintendent Hochman on February 5, 2013, attaching Dr. Nobler's clearance letter advising that he could return to work on February 11, 2013.

130. Upon receiving Heller's email with Dr. Nobler's clearance letter, Hochman forwarded the same to Chief Hayes and Chief Ryan that day with the accompanying message: "Hi – in the "you can't make this up" department – as I was standing at the command center today during our middle school evacuation, my phone is beeping away with emails and one came in from Adam Heller. The email is below and hospital letter attached. I will proceed with our attorney and set up a medical exam as well as a request for records. I'll keep you posted and will want to talk soon."

131. Nine minutes later, Hayes replied, "Unbelievable."

132. Fifteen minutes later, Ryan replied: "I can beat that. He sent his parents to the PD to pick up his guns!!! Had a very enlightening conversation with the US Attorney's office about this

matter. I am drafting a letter to Adam and his parents at this time. Will keep you in the loop as this progresses."

133. Though Ryan expressed surprise and dismay in his email about Heller's parents picking up his guns, in fact, he had spoken with Heller's father several days earlier while Heller was still hospitalized to arrange for his father to pick up the guns and dispose of them through a licensed firearm dealer.

134. As per his arrangement with Chief Ryan, Heller's father retrieved the firearms from Pound Ridge Police on February 11, 2013 on the condition that he not return them to Heller and sold them to a firearms dealer the next day.

**H. The Section 913 Evaluation.**

135. On January 30, 2013, after Heller had been discharged from the hospital, the police hand delivered to him at his home a letter of the same date from Dr. Hochman advising Heller that a "question has a arisen concerning your mental capacity" and that, pursuant to Section 913 of the New York State Education Law, the District would be directing him to undergo a psychiatric evaluation.

136. By letter February 7, 2013, Dr. Hochman directed Heller to undergo a psychiatric evaluation with Alexander Lerman, M.D. and to take a diagnostic personality evaluation administered by Dr. Lerman.

137. Pursuant to that letter, Mr. Heller met with Dr. Lerman on April 5, 2013 and May 9, 2013 and, as permitted by statute, Heller's then-attorney Michael Carr accompanied him to both interviews.

138. On Saturday morning April 6, 2013, the day after his first interview with Dr. Lerman, Heller took a computerized MMPI-2 personality test administered by Dr. Lerman and, consistent

with the District's instructions when directing him to undergo the evaluation, Dr. Lerman told Heller that he could have someone accompany him when coming to take the MMPI-2 test.

139. Pursuant to Dr. Lerman's advice and the District's instructions, Heller's friend, Stefan Feldman, accompanied him the morning he took the MMPI-2 test.

140. It took Heller about 35-40 minutes to complete the MMPI test.

141. Heller answered every question on the MMPI-2 test truthfully.

142. The results of Heller's MMPI-2 test were unremarkable and did not suggest that he suffered from any significant mental illness.

143. During both interviews with Dr. Lerman, Heller was calm and alert and answered each of Dr. Lerman's questions truthfully.

144. Heller cooperated fully with the entire evaluation process.

145. In May 2013, Dr. Lerman drafted a Psychiatric Evaluation Report that he provided to the District.

146. In his report, Dr. Lerman concluded that there was no evidence that Heller presented a risk of danger to others.

147. As reported to the District, Dr. Lerman was unable to provide any conclusive psychiatric diagnosis of Mr. Heller.

148. Despite Heller's compete cooperation with the entire evaluation process, Dr. Lerman falsely reported to the District that Heller did not cooperate and that Heller's non-cooperation precluded him from being able to conclusively diagnose him.

149. Dr. Lerman's report to the District is replete with false and misleading statements and information inserted therein for the purpose of supporting his claim that Heller did not cooperate.

## I.   The disciplinary charges and § 3020-a hearing.

150. By letter dated June 21, 2013 to the District Clerk of the Board, pursuant to New York Education Law § 3020-a, Superintendent Hochman proffered two disciplinary Charges against Mr. Heller, each with five Specifications.

151. The first Charge is labeled "Misconduct/Conduct Unbecoming a Teacher" and alleges: "You have failed to cooperate with an investigation of your mental fitness pursuant to Local [sic] 913 of the New York Education Law."

152. This charge initially contained five specifications:

   a.   Specification 1 – In a letter dated February 7, 2013, I directed you to undergo a medical examination by Dr. Alexander Lerman of 250 Bedford Road, Chappaqua, New York, to determine your capacity to safely and competently perform his [sic] duties.  In the same letter, I directed you to execute releases so that Dr. Lerman would receive copies of your medical and psychiatric records.  I repeated these directives in a letter dated February 25, 2013. These directives carried out a resolution of the Board of Education of the Bedford Central School District pursuant to Local [sic] 913 of the New York Education Law.  You failed to execute and return the release forms in a complete and timely manner.

   b.   Specification 2 – You failed to schedule a medical examination by Dr. Lerman within the time frame required by the February 25, 2013 letter referenced in Specification 1 above.

   c.   Specification 3 – When you were examined by Dr. Lerman on  April 5, 2013 and on May 9, 2013, you intentionally made false statements to him regarding, among other subjects, whether you had experienced depression or emotional distress in recent months, the nature and circumstances of your recent firearms purchases, the circumstances of your

20

childhood family life, your history of drug use, your history of psychiatric treatment, your history of suicidal ideation, and the circumstances of your recent hospitalization.

    d.  Specification 4 – When you took a written Minnesota Multiphasic Personality Inventory ("MMPI") personality test at Dr. Lerman's office on April 6, 2013, you intentionally gave false answers to a significant number of questions.

    e.  Specification 5 – Your failure to cooperate with Dr. Lerman has caused him to be unable to determine the degree to which you represent a risk to others.  You have to that extent frustrated the purpose of the Section 913 examination.

153. On the first day of the hearing, the District voluntarily dismissed the first two Specifications of this Charge.

154. The second Charge is labeled "Incompetence to Work as a Teacher Due to Mental Illness" and alleges:  "Due to an apparent mental illness, it would create an undue risk to the safety of the students and faculty of the Bedford Central School District if you were permitted to return to your duties."

155. The five underlying Specifications of Charge 2 allege:

    a.  Specification 1 – Dr. Lerman has concluded that you likely suffer from serious mental illness, including delusions of thought control, feelings of helplessness and anger, thoughts of suicide, a paranoid thought disorder, and the high risk of further deterioration and possible suicide, with the possibility of an acute risk to the safety of others.  He has determined that your fitness to function in a classroom setting depends upon your willingness to undergo sustained, intensive psychiatric treatment that you are unwilling to undergo.

b. Specification 2 – Your failure to cooperate with Dr. Lerman has caused him to be unable to determine the degree to which you represent a risk to others. Therefore it must be assumed that you do represent a risk to others.

c. Specification 3 – In an internet communication dated December 27, 2012, you expressed the belief that evil people had intentionally caused a blizzard and a hurricane, and you expressed the desire to "kill people" because of it.

d. Specification 4 – In an internet communication dated December 15, 2012, you expressed the belief that the United States government caused the shootings in a Newtown, Connecticut elementary school by "programming" the shooter. This indicates a risk that you may someday believe you are compelled to commit similar acts.

e. Specification 5 – Dr. Lerman has concluded that you have failed to cooperate with efforts to treat your mental illness in more than a superficial fashion, and that you are likely to continue to do so.

156. Dr. Hochman recommended to the Board a penalty of dismissal should Heller fail to request a hearing or if one or more of these charges are sustained.

157. Heller timely requested a hearing on the Charges by a sole hearing officer and a hearing ensued, Jeffery Sherman presiding as Hearing Officer.

158. Paragraph E of Article Nine of the Collective Bargaining Agreement ("CBA") between Heller's union and the District provides, in pertinent part: "When a complaint is made to the administration about a teacher, the administration shall confer with the teacher concerning the matter before any action detrimental to the teacher is taken or any record is placed in the teacher's permanent personnel file."

159. Despite having knowledge of law enforcement's concerns and complaints about Heller as early as January 8, 2013, in violation of the CBA, neither Hochman nor any other District administrator conferred with Heller regarding such concerns before directing him to undergo a Section 913 evaluation or propounding disciplinary charges against him.

160. Between December 2, 2013 and February 25, 2014, six witnesses gave testimony over the course of eight days (two appearances of which were telephonic). The record consists of a 1,672 page transcript and approximately 40 exhibits.

161. On May 12, 2014, the Hearing Officer issued his Decision, which sustained each and every charge and specification and imposed the penalty of discharge.

162. Thereafter, Heller commenced a special proceeding in New York State Supreme Court, County of Westchester under CPLR Article 75 to vacate the Hearing Officer's Decision and Award.

163. By Decision and Order dated October 2, 2014, Supreme Court denied Heller's Petition and affirmed the Hearing Officer's determination.

164. Heller timely noticed his appeal from Supreme Court's October 2, 2013 Decision and Order.

**J.   Effects on Mr. Heller.**

165. As a direct and proximate result of being falsely arrested, wrongfully involuntarily committed, retaliated against because of his protected speech and being the victim of professional malpractice, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

166. As a direct and proximate result of being falsely arrested, wrongfully involuntarily committed, retaliated against because of his protected speech and being the victim of professional

malpractice, Mr. Heller lost his employment and will likely never be able to teach again in New York State or any other state or obtain gainful employment appropriate to his education, experience and expertise anywhere.

167. As a direct and proximate result of being falsely arrested, wrongfully involuntarily committed, retaliated against because of his protected speech and being the victim of professional malpractice, Mr. Heller has been chilled in his ability to freely speak for fear of further retaliation by state actors and, in fact, has diminished his protected speech activities.

168. As a direct and proximate result of being falsely arrested, wrongfully involuntarily committed, retaliated against because of his protected speech and being the victim of professional malpractice, Mr. Heller has been forever prohibited from purchasing or owning any firearm.

169. As a direct and proximate result of being falsely arrested, wrongfully involuntarily committed, retaliated against because of his protected speech and being the victim of professional malpractice, Mr. Heller does not feel safe in his own town and that he cannot rely on the Town of Pound Ridge Police Department for protection, a feeling that caused him not to report to police a recent theft of over $200.00.

170. As a direct and proximate result of being falsely arrested, wrongfully involuntarily committed, retaliated against because of his protected speech and being the victim of professional malpractice, Mr. Heller has lost all respect and trust for the psychiatry profession, thus impacting his ability to ever seek treatment to the extent he might ever need such treatment in the future.

## CLAIMS FOR RELIEF

### FIRST CLAIM
(Against Defendants Town of Pound Ridge and David Ryan)
**False Arrest**
42 U.S.C. § 1983; U.S. Const., amend IV

171. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 170 above.

172. On the morning of January 18, 2013, Ryan made the determination, in his capacity as Chief of the Town of Pound Ridge Police Department, to effect a mental health arrest of Heller.

173. At the time he made this determination, Ryan did not possess any facts from which a reasonable officer would believe that Heller was suffering from a mental illness.

174. At the time he made this determination, Ryan did not possess any facts from which a reasonable officer would believe that Heller presented a risk of serious harm to himself or others.

175. In fact, at the time Ryan made this determination, Heller did not suffer from any mental illness and did not pose a risk of serious harm to himself or others.

176. As such, at the time he made this determination, Ryan lacked sufficient probable cause to effect a mental health arrest of Heller.

177. In the evening of January 18, 2013, Ryan told Heller that if he did not voluntarily accompany him to Westchester Medical Center to undergo a mental health evaluation that he had the authority to force him to go involuntarily and would use such authority.

178. At the time he made this threat, Ryan did not possess any facts from which a reasonable officer would believe that Heller was suffering from, or appeared to suffer from, a mental illness.

179. At the time he made this threat, Ryan did not possess any facts from which a reasonable officer would believe that Heller presented a risk of serious harm to himself or others.

180. In fact, at the time Ryan made this threat, Heller did not suffer from, or appear to suffer from, any mental illness and did not pose a risk of serious harm to himself or others.

181. Heller did not want to go with Ryan but did so, against his will, based upon Ryan's threat of involuntary compulsion.

182. By coercing Heller, against his will, to go to Westchester Medical Center for a mental health evaluation without probable cause to believe that Heller suffered from, or appeared to suffer from, a mental illness and presented a risk of serious harm to himself or others, Ryan falsely arrested Heller in violation of the Fourth Amendment of the United States Constitution as made actionable by 42 U.S.C. § 1983.

183. At all relevant times, Ryan was acting in his capacity as Chief of the Town of Pound Ridge Police Department and, as such, engaged in the conduct alleged herein under color of state law.

184. As Chief of the Town of Pound Ridge Police Department, Ryan is the final policymaker for the Town of Pound Ridge with respect to all law enforcement matters, including, without limitation, the Town's policies with respect to effecting arrests.

185. Accordingly, the Town of Pound Ridge is liable under Monell v. Dep't. of Social Services of the City of New York, 436 U.S. 658 (1978) for Ryan's unlawful conduct.

186. As a consequence of being falsely arrested, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

187. Heller's false arrest also precipitated the events leading to the termination of his employment as a tenured high school English teacher.

188. As a result, Heller has suffered significant economic and non-economic damages.

189. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

## SECOND CLAIM
**(Against Defendants Town of Pound Ridge, David Ryan and Westchester Medical Center)**
**False Arrest**
**42 U.S.C. § 1983; U.S. Const., amend IV**

190. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 189 above.

191. Heller was admitted to the medical emergency room at Westchester Medical Center on January 18, 2013.

192. In the late evening hours or January 18, 2013 or the early morning hours of January 19, 2013, Ryan told Heller that he was not permitted to leave the hospital and that, if he tried to leave, Ryan would find him, arrest him and bring him back to the hospital.

193. Consistent with this threat, Ryan stationed two armed and uniformed police officers outside of Heller's room on January 18, 2013 and January 19, 2013 to prevent him from leaving.

194. Under the significant influence of the materially false and inflammatory information provided to it by law enforcement, and being coerced by law enforcement and conspiring with law enforcement to prevent Heller from leaving, Westchester Medical Center provided PAs in Heller's room from January 18, 2013 to January 23, 2013 to prevent him from leaving.

195. Heller did not want to stay but did so, against his will, because of Ryan's threat that he would be arrested and brought back if he tried to leave.

196. As a result, Heller remained admitted to the medical service of Westchester Medical Center from January 18, 2013 to January 23, 2013.

27

197. Neither at the time Ryan instructed Heller not to leave, nor at any time between January 18, 2013 and January 23, 2013, did Ryan possess any facts from which a reasonable officer would believe that Heller was suffering from, or appeared to suffer from, a mental illness.

198. Neither at the time Ryan instructed Heller not to leave, nor at any time between January 18, 2013 and January 23, 2013, did Ryan possess any facts from which a reasonable officer would believe that Heller presented a risk of serious harm to himself or others.

199. In fact, neither at the time Ryan instructed Heller not to leave, nor at any time between January 18, 2013 and January 23, 2013, did Heller suffer from, or appear to suffer from, any mental illness or pose a risk of serious harm to himself or others.

200. By coercing Heller to remain admitted to the medical service at Westchester Medical Center from January 18, 2013 to January 23, 2013 and preventing him from leaving without probable cause to believe that Heller suffered a mental illness and presented a risk of serious harm to himself or others, Ryan falsely arrested Heller in violation of the Fourth Amendment to the United States Constitution as made actionable by 42 U.S.C. § 1983.

201. At all relevant times, Ryan was acting in his capacity as Chief of the Town of Pound Ridge Police Department and, as such, engaged in the conduct alleged herein under color of state law.

202. As Chief of the Town of Pound Ridge Police Department, Ryan is the final policymaker for the Town of Pound Ridge with respect to all law enforcement matters, including, without limitation, the Town's policies with respect to effecting arrests.

203. Accordingly, the Town of Pound Ridge is liable under Monell v. Dep't. of Social Services of the City of New York, 436 U.S. 658 (1978) for Ryan's unlawful conduct.

204. By conspiring with law enforcement to prevent Heller from leaving the hospital between January 18, 2013 and January 23, 2013 by providing PAs to prevent him from leaving, Westchester Medical Center participated in, and is liable for, Heller's false arrest in violation of the Fourth Amendment to the United States Constitution as made actionable by 42 U.S.C. § 1983.

205. As a consequence of being falsely arrested, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

206. Heller's false arrest also precipitated the events leading to the termination of his employment as a tenured high school English teacher.

207. As a result, Heller has suffered significant economic and non-economic damages.

208. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

## THIRD CLAIM
**(Against Defendants Susan Kemker, M.D., Westchester Medical Center, David Ryan and Town of Pound Ridge)**
**Violation of Substantive Due Process and Unlawful Seizure**
**42 U.S.C. § 1983; U.S. Const., amends IV and XIV**

209. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 208 above.

210. On January 23, 2013, defendant Kemker signed a certification causing Heller's involuntary commitment to Westchester Medical Center's Behavioral Health Center pursuant to Section 9.39 of New York State Mental Hygiene Law.

211. A proper involuntary commitment requires a determination by a staff physician that the patient suffers from a mental illness for which inpatient psychiatric treatment is necessary and appropriate and which mental illness is likely to result in serious harm to himself or others, meaning that the patient presents a "substantial risk of physical harm to himself as manifested by

29

threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical injury." N.Y. Mental Hygiene L. § 9.39(a).

212.  To comport with due process, Dr. Kemker must have determined that Heller satisfied the standard set forth in the foregoing paragraph and her determination must have been made in accordance with standards generally accepted in the medical community.

213.  Under generally accepted medical standards, a staff physician must identify and weigh known risk factors for dangerousness to self or others and examine whether the same, when viewed under the totality of circumstances and in light of the facts specific to the patient, demonstrate a serious present threat of harm.

214.  Dr. Kemker's determination to involuntarily commit Heller fell substantially below standards generally accepted in the medical community for determining whether or not to involuntarily commit a patient because she failed to adequately identify and weigh known risk factors and to evaluate whether the same, when viewed in the totality of the circumstances and in light of Mr. Heller's particular situation, suggested that Heller might pose a serious present risk of harm.

215.  Dr. Kemker's determination to involuntarily commit Heller fell substantially below standards generally accepted in the medical community also because, at the time she made her determination, she lacked any reasonable factual basis to conclude that Heller presented a substantial risk of physical harm to himself or others.

216.  Specifically, Dr. Kemker's determination failed to adequately assess whether or not Heller then currently presented a substantial risk of physical harm to himself and, to the extent she

concluded that he did, her determination was not based upon standards generally accepted in the medical community for so determining the same.

217. For instance, her medical note discusses ambiguous remarks Heller allegedly made days, weeks, months and/or years prior relayed to her by family members and the police and referenced in earlier portions of his medical chart, but does not reference anything he told her during her evaluation of him.

218. Significantly, Heller's Suicide Risk Assessment, completed the same day of his involuntary commitment and included in his chart, indicates that Heller had no prior or present intent to die, had made no present attempts or plans to commit suicide and had never made any prior attempts to commit suicide.

219. Moreover, plaintiff's medical records demonstrate that, apart from a handful of sporadic ambiguous existential remarks about feeling spiritual stagnation, past mild depression and not being happy with the present state of affairs in the world, he consistently and repeatedly denied any suicidal ideation and explicitly told doctors, including Kemker, that he did not wish to die or commit suicide.

220. To conclude that a person presents a substantial present risk of physical harm to himself where such person, like Mr. Heller, has never engaged in any behavior or conduct demonstrating such risk, has never expressed an intent or threat to harm himself and has never made any attempts to do so falls below standards generally accepted in the medical community.

221. In short, there is no reasonable factual basis supporting Dr. Kemker's conclusion and no reasonable physician employing generally accepted medical standards and exercising reasonable diligence would have, or could have, concluded that Heller presented a substantial risk of physical harm to himself.

31

222. Likewise, Dr. Kemker's determination fails to adequately assess whether or not Heller then currently presented a substantial risk of physical harm to other persons and, to the extent she concluded that he did, her determination was not based upon standards generally accepted in the medical community for so determining the same.

223. For instance, Heller has no history of violence and there is no evidence in his medical records or otherwise from which Dr. Kemker could have concluded otherwise.

224. Moreover, Heller consistently and repeatedly denied any homicidal ideation and never once expressed any interest or intent in harming any other human being.

225. In fact, his mental status exams indicated that he had no violent thoughts and his medical records were replete with his denials of the same.

226. In addition to the absence of any evidence of any examples of any overt dangerous behavior or thoughts on Heller's part, no other known risk factor reasonably indicated that Heller presented a substantial risk of harm to any other person.

227. To conclude that a person presents a substantial risk of physical harm to another person where such person, like Mr. Heller, has never engaged in any behavior or conduct demonstrating such risk, has never expressed an intent or threat to harm another person, has never made any attempts to do so in the past and where no other known risk factor indicates a potential risk for violence falls below standards generally accepted in the medical community.

228. In short, there is no reasonable factual basis supporting Dr. Kemker's conclusion and no reasonable physician employing generally accepted medical standards and exercising reasonable diligence would have, or could have, concluded that Heller presented a substantial risk of physical harm to others.

229. Westchester Medical Center was aware of and approved Dr. Kemker's determination to involuntarily commit Heller and permitted Heller to remain involuntarily committed in its psychiatric unit from January 23, 2013 to January 30, 2013 on the basis of Kemker's determination.

230. Dr. Kemker's determination to involuntarily commit Heller was significantly influenced and encouraged by the materially false and inflammatory information provided by law enforcement and which she otherwise did not corroborate or attempt to corroborate with Mr. Heller or otherwise.

231. For instance, Dr. Kemker states in her medical note that Heller reportedly made homicidal and threatening comments on internet postings but, in fact, Heller never made any such comments and there is no evidence Dr. Kemker attempted to corroborate this information, which had been provided to her orally by law enforcement.

232. Dr. Kemker also indicates in her medical note that Heller was currently abusing substances and refers to "marijuana and a white crystalline substance" found in Heller's home, a piece of information provided by law enforcement. In fact, no such substances were found in Heller's home and he never admitted to anyone that he then abused any such substances; in fact his toxicology report, contained in his medical chart and available for Dr. Kemker's review, indicates that he tested negative for all illicit substances, thus controverting any claim that he presently abused any such substances.

233. Dr. Kemker also refers to Heller's reported desire to purchase a "collapsible gun" that could "fit inside his backpack," another piece of information provided by law enforcement. But Heller explained that the Ruger 10/22 rifle he researched but did not purchase simply has a removable barrel and, consistent with his protected rights, he was interested in the same as a survivalist firearm in the event of a major catastrophe. There is simply no basis, other than law

33

enforcement's inflammatory mischaracterization of Heller's intent, to conclude that Heller had any illicit plans for the firearm.

234. Upon information and belief, law enforcement, including Chief Ryan, maintained consistent communications with Westchester Medical Center, including Dr. Kemker and other physicians involved in Heller's commitment and treatment, and, by providing materially false and inflammatory information and specifically demanding so, coerced Dr. Kermker's determination to involuntarily commit Heller.

235. Accordingly, Dr. Kemker and Westchester Medical Center were acting under color of state law when making the determination to involuntarily commit and retain Mr. Heller as a patient from January 23, 2013 to January 30, 2013.

236. At all relevant times, Ryan was acting in his capacity as Chief of the Town of Pound Ridge Police Department and, as such, engaged in the conduct alleged herein under color of state law.

237. By involuntarily committing Heller without making a valid determination in accordance with generally accepted medical standards that he presented a substantial risk of danger to himself or others, as coerced by law enforcement, defendant Kemker violated Heller's Fourteenth Amendment substantive due process right to liberty and his Fourth Amendment right to be free from unreasonable seizures, both of which are made actionable by 42 U.S.C. § 1983.

238. By condoning and acquiescing in Dr. Kemker's unlawful determination and, pursuant to its policies and procedures, retaining Heller as an involuntarily committed patient for a period of one week, defendant Westchester Medical Center was personally involved in depriving Heller of his Fourteenth and Fourth Amendment rights and is liable to him therefor under 42 U.S.C. § 1983.

34

239. By coercing Dr. Kemker's unlawful determination by, *inter alia*, providing false and inflammatory information to her and other physicians and significantly influencing the medical staff to commit Heller, defendant Ryan was personally involved in depriving Heller of his Fourteenth and Fourth Amendment rights and is liable to him therefor under 42 U.S.C. § 1983.

240. As Chief of the Town of Pound Ridge Police Department, Ryan is the final policymaker for the Town of Pound Ridge with respect to all law enforcement matters, including, without limitation, the Town's policies with respect to effecting arrests.

241. Accordingly, the Town of Pound Ridge is liable under <u>Monell v. Dep't. of Social Services of the City of New York,</u> 436 U.S. 658 (1978) for Ryan's unlawful conduct.

242. As a consequence of being wrongfully involuntarily committed, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

243. Heller's wrongful involuntarily commitment also precipitated the events leading to the termination of his employment as a tenured high school English teacher.

244. As a result, Heller has suffered significant economic and non-economic damages.

245. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

**FOURTH CLAIM**
**(Against Defendants Susan Kemker, M.D., Westchester Medical Center, David Ryan and Town of Pound Ridge)**
**Conspiracy to Violate Substantive Due Process Rights and to Unlawfully Seize**
**42 U.S.C. § 1983; U.S. Const., amend XIV**

246. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 245 above.

247. As described herein, defendants Kemker, Westchester Medical Center, David Ryan and Town of Pound Ridge came to an agreement, either explicit or tacit, to involuntarily commit Mr.

Heller and, since the determination to commit Heller was not made in accordance with generally accepted medical standards, these defendants unlawfully conspired to deprive Heller of his substantive due process right of liberty and Fourth Amendment right to be free from unreasonable seizures.

248. At all relevant times, these defendants were acting under color of state law.

249. As a consequence of being wrongfully involuntarily committed, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

250. Heller's wrongful involuntarily commitment also precipitated the events leading to the termination of his employment as a tenured high school English teacher.

251. As a result, Heller has suffered significant economic and non-economic damages.

252. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

## FIFTH CLAIM
### (Against Westchester Medical Center)
### Violation of Procedural Due Process
### 42 U.S.C. § 1983; U.S. Const., amend XIV

253. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 252 above.

254. Pursuant to Section 9.39 of New York Mental Hygiene Law, a person involuntarily committed because a staff physician determines that the person presents a substantial risk of physical harm to himself or others "shall not be retained for a period of more than forty-eight hours unless within such period such finding is confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital." N.Y. Mental Hygiene L. § 9.39(a).

255. Dr. Kemker determined to involuntarily commit Mr. Heller in accordance with Section 9.39 on January 23, 2013 and, thus, pursuant to the terms of that provision, he could not be held

36

past January 25, 2013 unless a physician on Westchester Medical Center's psychiatry staff confirmed Dr. Kemker's determination on or before January 25, 2013.

256. Since no physician on Westchester Medical Center's psychiatry staff confirmed Dr. Kemker's determination on or before January 25, 2013 Westchester Medical Center acted in contravention of the clear terms of New York Mental Hygiene Law when it retained Heller as an involuntary patient until January 30, 2013.

257. Westchester Medical Center's decision to retain Mr. Heller as an involuntary patient from January 25, 2013 to January 30, 2013 was coerced by law enforcement as described herein, including, *inter alia*, by the false and inflammatory information provided to it by defendant Ryan and his substantial influence in the decision-making process.

258. By retaining Mr. Heller as an involuntary patient from January 25, 2013 to January 30, 2013, as coerced by law enforcement, Westchester Medical Center acted under color of state law and violated Heller's procedural due process right to have the commitment determination made in conformity with State statutory standards, which right is made actionable under 42 U.S.C. § 1983.

259. As a consequence of this deprivation of procedural due process, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

260. Heller's wrongful involuntarily commitment also precipitated the events leading to the termination of his employment as a tenured high school English teacher.

261. As a result, Heller has suffered significant economic and non-economic damages.

262. Defendant acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

## SIXTH CLAIM
### (Against Susan Kemker M.D. and Westchester Medical Center)
### Malpractice

263. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 262 above.

264. Dr. Kemker owed Heller a duty to exercise reasonable care and act in accordance with generally accepted medical standards when evaluating and treating Heller and in making the determination of whether or not to involuntarily commit him for inpatient psychiatric services.

265. A reasonable physician acting prudently under the circumstances would not involuntarily commit a patient pursuant to Section 9.39 of New York State Mental Hygiene Law unless that patient presented a substantial risk of physical harm to himself or others as manifested by behavior exhibiting such risk, and Dr. Kemker had owed a duty to Heller to conform to this standard when making her determination as to whether or not to involuntarily commit him.

266. Since Dr. Kemker failed to conduct a proper evaluation of Heller and otherwise lacked any reasonable factual basis to conclude that Heller presented a substantial risk of physical harm to himself or others, and since no reasonable physician under the same circumstances would have concluded that Heller presented such a risk, Dr. Kemker breached her duty of care to Heller by involuntarily committing him.

267. Dr. Kemker's breach directly and proximately caused Heller to be involuntarily committed to Westchester' Medical Center's Behavioral Health Center from January 23, 2013 to January 30, 2013.

268. As a direct and proximate cause of Dr. Kemker's breach, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

269. Heller's wrongful involuntarily commitment also precipitated the events leading to the termination of his employment as a tenured high school English teacher, and thus this consequence was a direct and proximate cause of Dr. Kemker's breach.

270. As a result, Heller has suffered significant economic and non-economic damages.

271. As Dr. Kemker's employer, defendant Westchester Medical Center is liable to Heller for Dr. Kemker's negligence under the doctrine of *respondeat superior*.

272. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

<div align="center">

**SEVENTH CLAIM**
**(Against Westchester Medical Center)**
**Malpractice**

</div>

273. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 272 above.

274. As a medical facility operating in New York State and permitted to retain patients involuntarily pursuant to State statutes and regulations, defendant Westchester Medical Center owed Mr. Heller a duty of reasonable care to ensure that it and its physicians were acting in conformity with all relevant laws and regulations when making the determination of whether or not to involuntarily commit and retain patients.

275. Westchester Medical Center breached this duty of care by permitting Mr. Heller to be involuntarily committed and retained for a one week period despite the fact that he did not present a substantial risk of physical harm to himself or others.

276. Westchester Medical Center also breached this duty by permitting Heller to be retained involuntarily from January 25, 2013 to January 30, 2013 despite the fact that no physician on its psychiatry staff confirmed Dr. Kemker's initial determination within forty-eight hours thereof and,

thus, directly contravening the clear mandate of Section 9.39 of New York Mental Hygiene Law which prohibits hospitals from retaining a patient involuntarily more than forty-eight hours after the initial determination without such confirmation.

277. Westchester Medical Center's breach directly and proximately caused Heller to be involuntarily committed to Westchester' Medical Center's Behavioral Health Center from January 23, 2013 to January 30, 2013.

278. As a direct and proximate cause of this breach, Heller was deprived of his liberty and made to suffer humiliation, embarrassment and mental anguish.

279. Heller's wrongful involuntarily commitment also precipitated the events leading to the termination of his employment as a tenured high school English teacher, and thus this consequence was a direct and proximate cause of Dr. Kemker's breach.

280. As a result, Heller has suffered significant economic and non-economic damages.

281. Defendant acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

### EIGHTH CLAIM
#### (Against Bedford Central School District and Dr. Jere Hochman)
#### Retaliation for Protected Speech
#### 42 U.S.C. § 1983; U.S. Const., amend I

282. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 281 above.

283. Heller discussed with Ms. O'Connor his concerns about, *inter alia*, governmental power and corruption and the possibility of certain governmental conspiracies.

284. Heller's discussions touched on matters of public concern and he spoke with Ms. O'Connor about these issues as a private citizen, not in his role as public employee.

285. During his conversations with Ms. O'Connor, Heller did not make specific threats to any person or exhibit any propensity for dangerousness, either imminent or latent.

286. Accordingly, Heller's conversations with Ms. O'Connor constituted protected speech.

287. In his report to the District, Dr. Lerman summarized many of the topics Heller discussed with Ms. O'Connor.

288. Mr. Heller also engaged in protected activity by legally acquiring and researching firearms.

289. Solely on the basis of Heller's protected activity as described herein, and without any other legitimate motivation, Defendant Hochman recommended to defendant Bedford Central School District that Heller undergo a mental health evaluation pursuant to Section 913 of New York State Education Law to determine whether or not Heller was psychiatrically fit to continue teaching.

290. Defendant Bedford Central School District accepted Dr. Hochman's recommendation and directed Heller to undergo the Section 913 evaluation.

291. Despite Dr. Lerman's explicit finding that Heller did not present an acute risk of harm to others and his inability to determine whether or not Heller was psychiatrically fit to continue teaching, defendant Hochman, motivated solely by Heller's protected activity as described herein, and without any other legitimate motivation, recommended to defendant Bedford Central School District that Heller be charged with misconduct and incompetence charges pursuant to Section 3020-a of New York State Education Law and that his employment be terminated.

292. Defendant Bedford Central School District accepted Dr. Hochman's recommendation, adopted Dr. Hochman's proffered charges and propounded the same against Heller.

293. But for Heller's protected activity and defendant Hochman's retaliatory animus, which tainted the defendant Board's determinations, Heller would not have been served with disciplinary charges, made to defend against the same and, upon the hearing officer's sustaining such charges, terminated from his employment as a tenured English teacher in the District.

294. By directing Heller to undergo a Section 913 evaluation, propounding disciplinary charges against him and ultimately terminating his employment solely on the basis of his protected activity, defendants Hochman and the District violated Heller's First Amendment right to free speech as made actionable under 42 U.S.C. § 1983.

295. As a direct and proximate result of this violation, Mr. Heller lost his employment and will likely never be able to teach again in New York State or any other state or obtain gainful employment appropriate to his education, experience and expertise anywhere.

296. As a direct and proximate result of this violation, Mr. Heller suffered humiliation, embarrassment and mental anguish.

297. As a direct and proximate result of this violation, Mr. Heller has felt chilled in his ability to freely speak for fear of further retaliation by state actors and, in fact, has diminished his protected speech activities.

298. As a result, Heller has suffered significant economic and non-economic damages.

299. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

## NINTH CLAIM
### (Against Bedford Central School District, Dr. Jere Hochman, Town of Pound Ridge and David Ryan)
### Conspiracy to Retaliate for Protected Speech
### 42 U.S.C. § 1983; U.S. Const., amend I

300. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 299 above.

301. On or about January 8, 2013, Defendant Ryan, in his capacity as Chief of the Town of Pound Ridge Police Department began communicating with defendant Hochman regarding Heller and, in particular, regarding Heller's protected activity as described herein.

302. Motivated solely by Mr. Heller's protected activity, defendant Ryan sought to have Heller's employment as a tenured public school teacher in the District terminated and came to an agreement, either explicit or tacit, with defendant Hochman and the District to achieve this end.

303. This agreement included, *inter alia*, investigating Mr. Heller, arresting him, unlawfully detaining him and having him involuntarily committed to a psychiatric facility despite the fact that there was no reasonable legitimate basis to do so.

304. As part of this agreement, Hochman agreed to assist in the investigation by monitoring Heller, providing updates and information to police and allowing police, including the school resource officer, to increase their vigilance at the school and to further monitor Heller there.

305. Ryan's conduct aided Hochman and the District in their ability to propound and prosecute disciplinary charges against Heller and ultimately to terminate his employment.

306. Throughout the investigation, and even after Heller had been discharged from the hospital and cleared to work, Ryan expressed his strong opinion to Hochman that Heller should not be permitted to return to the school.

307. Despite having known Heller for a substantially longer period of time than any member of law enforcement and being aware of Heller's consistent and positive performance in the District, the lack of any complaints about him and the lack of any misconduct on his part, Hochman accepted Ryan's view and committed himself and the District to preventing Heller from returning to school and to ending his career as a public school teacher.

308. By so conspiring to retaliate against Heller because of his protected activity, these defendants violated Heller's First Amendment right to free speech, as made actionable by 42 U.S.C. § 1983.

309. As a direct and proximate result of this conspiracy, Mr. Heller lost his employment and will likely never be able to teach again in New York State or any other state or obtain gainful employment appropriate to his education, experience and expertise anywhere.

310. As a direct and proximate result of this conspiracy, Mr. Heller suffered humiliation, embarrassment and mental anguish.

311. As a direct and proximate result of this conspiracy, Mr. Heller has been chilled in his ability to freely speak for fear of further retaliation by state actors and, in fact, has diminished his protected speech activities.

312. As a result, Heller has suffered significant economic and non-economic damages.

313. Defendants acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

**TENTH CLAIM**
**(Against Alexander Lerman, M.D.)**
**Malpractice**

314. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 313 above.

315. In April and May 2013, Defendant Lerman conducted a psychiatric evaluation of Heller pursuant to Section 913 of New York State Education Law and, in May 2013, produced a report of his evaluation.

316. In December 2013 and January 2014, Dr. Lerman testified at Mr. Heller's disciplinary hearing.

317. As directed, Mr. Heller attended each of two scheduled evaluation sessions and took a computerized MMPI-2 personality test.

318. Mr. Heller answered each of Dr. Lerman's questions truthfully and did not intentionally provide any materially false answers or information. He cooperated fully with the interview process.

319. Despite this fact, Dr. Lerman falsely reported to the District that Heller did not cooperate and had intentionally provided materially false answers and information and testified to the same at the disciplinary hearing.

320. It took Mr. Heller approximately 35-40 minutes to complete the MMPI-2 test and he answered each of the 338 questions truthfully and did not intentionally provide any materially false answers.

321. Despite this fact, Dr. Lerman falsely reported to the district that Heller intentionally provided false answers to a significant number of questions on the MMPI-2 test and testified to

the same at the disciplinary hearing. He also falsely testified that it took Heller three hours to complete the MMPI-2 test.

322. During the interview process, Dr. Lerman never asked Mr. Heller about past drug use and, thus, Mr. Heller had no occasion to provide information about past drug use.

323. But despite these facts, Dr. Lerman falsely reported to the District that Heller denied any history of past drug use and that such denial was a lie.

324. Dr. Lerman asked Heller specific questions about Heller's interest in Carl Jung and, after Heller honestly and directly answered all of Lerman's questions, Lerman quickly changed the subject, inquiring when Heller was born and then proceeded with a different line of questioning; however in his report to the District, in an attempt to support his claim that Heller did not cooperate, Lerman falsely reported that Heller refused to answer his questions about Jung or elaborate thereupon.

325. In his report to the District, Dr. Lerman falsely claimed that Heller lied in describing his childhood as "happy" and "uncomplicated"

326. In fact, Heller never described to Lerman his childhood life as "happy and uncomplicated" but only that he had a "nice upbringing," and Dr. Lerman had absolutely no evidence reasonably contradicting this account.

327. Based upon information provided to him by the police and the WMC doctors, Heller believed that his Facebook postings were what caused the police concern and he communicated this belief to Dr. Lerman during the interview process.

328. At the second interview, Dr. Lerman knew that Heller's speech, which motivated the police action, was not contained in any Facebook posting, but rather was part of his private chat communication with Ms. O'Connor.

329. But despite knowing this and having in his custody a copy of the chat log, Dr. Lerman did not advise Heller of the same and, instead, led Heller to continue believing that his Facebook posts contained the alleged troubling comments.

330. Then, after Lerman asked Heller about particular comments, which unbeknownst to Heller were contained in the chat log, and Heller denied making such comments in his Facebook posts, and despite Heller's repeated requests for Lerman to share with him the exact quotes and Lerman's refusal to do so, Lerman reported to the District that Heller was uncooperative when asked about these comments and their import.

331. Lerman's report to the District is otherwise replete with false and misleading statements and information inserted therein for the express purpose of supporting his claim that Heller did not cooperate with the evaluation process thereby thwarting his ability to conclusively diagnosis him.

332. In evaluating Mr. Heller and preparing his report to the District, Dr. Lerman owed Heller a duty to exercise reasonable care and act as a reasonable physician under the circumstances.

333. No reasonable physician would mischaracterize a subject's performance or make false reports and, by doing so, defendant Lerman breached his duty to Heller.

334. As a direct and proximate result of defendant Lerman's breach, the District propounded disciplinary charges against Heller and, ultimately, terminated his employment.

335. As a direct and proximate result of Lerman's breach, Mr. Heller lost his employment and will likely never be able to teach again in New York State or any other state or obtain gainful employment appropriate to his education, experience and expertise anywhere.

336. As a direct and proximate result of defendant Lerman's breach, Heller suffered humiliation, embarrassment and mental anguish.

337. As a result, Heller has suffered significant economic and non-economic damages.

338. Defendant acted maliciously and in willful, reckless and wanton disregard for Heller's rights.

## ELEVENTH CLAIM
### (Against All Defendants)
### Denial of Right to Keep and Bear Arms
### 42 U.S.C. § 1983; U.S. Const., amend II

339. Plaintiff hereby realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 338 above.

340. As a direct and proximate result of the defendants' misconduct, Heller's legally obtained firearms and his right to legally obtain others has been denied to him unlawfully.

341. As a result, Heller has suffered and will continue to suffer harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Assume jurisdiction over this action and all parties;

B. Empanel a jury to hear all claims;

C. Award to Plaintiff compensatory damages against each defendant;

D. Award to Plaintiff punitive damages against each defendant against whom punitive damages are recoverable;

E. Award to Plaintiff the reasonably incurred attorneys' fees and litigation costs associated with the prosecution of this matter;

F. Order defendant Bedford Central School District to rescind Heller's termination and expunge all documents and records relating to Heller's disciplinary charges from his personnel file;

G. Order defendant Westchester Medical Center to properly train and supervise each and every staff member associated with the involuntary commitment process in a manner which is calculated to insure that there is no repetition of the abuses which occurred to the Plaintiff;

H. Order defendant Town of Pound Ridge to properly train its police force with respect to the requirements of New York State Mental Hygiene Law for effecting mental health arrests in a manner which is calculated to insure that there is no repetition of the abuses which occurred to the Plaintiff;

I. Order that all records that would affect Heller's ability to keep and bear arms be expunged and that the legal standing he had before the defendants' misconduct complained of herein to keep and bear arms be restored;

J. Order defendant Westchester Medical Center to expunge all records relating to and resulting from Mr. Heller's involuntary commitment;

K. Order defendant Lerman to expunge his May 2013 Psychiatric Evaluation Report of Mr. Heller; and

L. Award such additional relief as the Court deems just, proper and equitable under the circumstances.

Dated: Goshen, New York
       January 29, 2015

<div style="margin-left: 40%;">

SUSSMAN AND WATKINS
*Attorneys for Plaintiff*

By: _____

Michael H. Sussman, Esq. (3497)
P.O. Box 1005
1 Railroad Avenue, Ste. 3
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]

</div>