USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 17, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                       :

ADAM HELLER,                   :
                       :

             Plaintiff,      :
                       :

         -v-          :       15-cv-705 (KBF)
                       :

BEDFORD CENTRAL SCHOOL DISTRICT, et al.,:   OPINION & ORDER
                       :

          Defendants.    :
                       :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

Plaintiff Adam Heller ("Heller" or "plaintiff"), a former public high school English teacher, brought this action under 42 U.S.C. § 1983 alleging numerous claims arising under the First, Second, Fourth and Fourteenth Amendments against defendants Town of Pound Ridge (the "Town"), its police chief David Ryan ("Chief Ryan"), Bedford Central School District (the "District"), its superintendent Dr. Jere Hochman ("Dr. Hochman"), and Westchester Medical Center ("WMC"), along with a number of state law malpractice claims against WMC and defendants Drs. Susan Kemker ("Dr. Kemker") and Alexander Lerman ("Dr. Lerman").[1]

Plaintiff's claims arise from a series of alleged actions taken by varying overlapping sets of defendants primarily in or about January 2013 following an anonymous call alerting authorities to potential instability in plaintiff's mental health, investigation of plaintiff's disturbing online conversations referencing, <u>inter</u>

---

[1] On April 28, 2015, plaintiff agreed to dismiss all claims against Dr. Lerman without prejudice. (<u>See</u> April 28, 2015 Minute Entry.)

alia, killing people, and plaintiff's concurrent purchase of multiple firearms. Plaintiff alleges false arrest, involuntary commitment at WMC, termination as a tenured high school English teacher, violation of his alleged right to possess his firearms under these circumstances, and chilling of his speech and expressive conduct.[2]

Pending before the Court are two motions to dismiss under Rule 12(b)(6) filed by the District and Dr. Hochman (ECF No. 32), and by the Town and Chief Ryan (ECF No. 35). The motions raise numerous grounds for dismissal. As set forth below, the Court finds many of these arguments meritorious in light of the particular factual circumstances alleged and the context of this case. Because the Court's decision rests on the particular circumstances present here, the Court emphasizes that its decision should not be interpreted as supporting or allowing for a diminution of the First Amendment and other rights of, inter alia, public school teachers. Rather, the Court's decision reflects the fact that the complaint—when viewed in conjunction with the substantial existing record of plaintiff's prior state administrative and court proceedings (incorporated by reference into the complaint)—shows that defendants acted carefully, deliberately, and incrementally to address justifiable concerns raised by plaintiff's delusional and potentially dangerous behavior. For these reasons, and those set forth below, the motions to dismiss are GRANTED.

---

[2] Prior to bringing this suit, plaintiff's employment was terminated by a hearing officer pursuant to a N.Y. Education Law § 3020-a disciplinary proceeding, a decision affirmed by the New York State Supreme Court and currently on appeal to the New York State Appellate Division.

I.      FACTUAL BACKGROUND

     A.      Materials Considered on Defendants' Motions

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court is ordinarily limited to consideration of the factual allegations set forth in the plaintiff's complaint.  Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).  However, the court may supplement those allegations with facts from documents either referenced therein or relied upon in framing the complaint, see DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010), or documents upon which the complaint solely relies and which are integral to it, Roth, 489 F.3d at 509.  "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the documents on a dismissal motion; mere notice or possession is not enough."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original).

Courts may also properly consider statements set forth in documents of which judicial notice may be taken where the plaintiff relied on the contents of the documents in drafting the complaint, but only to establish the existence of an opinion, not for the truth of the facts asserted.  Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).  "'The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  Corley v. Jahr, No. 11 Civ. 9044(RJS)(KNF), 2013 WL 265450, at *5 (S.D.N.Y. Jan. 24, 2013) (quoting Fed. R. Evid. 201(b)).

In this case, the complaint directly references and discusses the content of plaintiff's online chat communications with Georgia O'Connor (June 15, 2015 Decl. of Steven C. Stern ("Stern Decl."), Ex. C at 41, ECF No. 36; see Compl. ¶¶ 41-48, ECF No. 1), the hearing officer's decision in plaintiff's N.Y. Education Law § 3020-a disciplinary proceeding (Stern Decl., Ex. B; see Compl. ¶¶ 150-61), and plaintiff's appeals of the § 3020-a hearing to the New York State Supreme Court, Westchester County, and the New York State Appellate Division, Second Department (June 15, 2015 Aff. of Richard G. Kass ("Kass Aff."), ECF No. 33; see Compl. ¶¶ 162-64). Plaintiff does not dispute the authenticity of these materials. Because these materials are integral to the complaint and incorporated by reference therein, the Court may properly consider them in relation to the pending motions.

The facts set forth below, which the Court accepts as true for purposes of this motion, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), are alleged in the complaint or are integral to or incorporated by reference into the complaint. Although the records from plaintiff's § 3020-a hearing and subsequent state court litigation are voluminous, the Court here recounts only those factual allegations relevant to resolving the pending motions, or to providing helpful background information.

B.   General Background

At the time plaintiff filed this suit (and during the period relevant to the complaint), he was a thirty-six year old resident of the Town of Pound Ridge, Westchester County, New York. (Compl. ¶ 4.) Until the events giving rise to this suit, plaintiff was employed as a tenured English teacher at Fox Lane High School in the Bedford Central School District, located in Westchester County. (Compl. ¶¶

5, 21-22.)  He had regular contact with 125-150 students each semester.  (Compl. ¶ 24.)  The District is comprised of five elementary schools, one middle school, and one high school, and is superintended by Dr. Hochman and governed by a seven-member Board of Education.  (Compl. ¶ 5.)

C.   Plaintiff's December 2012 – January 2013 Activities and Resulting Law Enforcement Investigation

On December 13, 2012, plaintiff purchased a Winchester Model 1300 12-gauge pump action shotgun from Precision Armory, a retail seller of firearms. (Compl. ¶¶ 29, 32.)  This was his first firearm purchase.  (Compl. ¶ 33.)  The next day, December 14, 2012, plaintiff returned to Precision Armory and purchased a Mosin Nagant bolt action rifle.  (Compl. ¶ 34.)  A "couple of weeks" later, a friend gave plaintiff a .22 caliber rifle.  (Compl. ¶ 36.)  In early January 2013, plaintiff became interested in purchasing a Ruger 10/22 .22 caliber rifle "as a survivalist tool in the event of a major catastrophe," although he did not ultimately purchase one. (Compl. ¶ 39.)

On December 7, 2012, less than a week before he bought his first firearm, plaintiff began an online conversation with a friend named Georgia O'Connor through Words with Friends, an online Scrabble game with a private instant messaging feature.  (Compl. ¶¶ 41-42, 45.)  Ms. O'Connor is a medium—one who communicates with spirits—by profession.  (Compl. ¶ 41.)  That conversation remained ongoing for approximately one month until about January 10, 2013. (Compl. ¶ 45.)  Among the topics that plaintiff discussed with Ms. O'Connor were the school shootings that occurred at Sandy Hook Elementary School in Newtown,

Connecticut, on December 14, 2012, and the potential misuse by the government of technology to affect weather patterns.  (Compl. ¶ 46.)  In a December 27, 2012 exchange, after O'Connor's asked "what are you up to?", plaintiff responded:

> stewing in anger . . . because the snow you are about to clean up was created artificially . . . as was the wind that lasted for 30 hours straight . . . so was "hurricane" sandy . . . i'm really pissed . . . and want to kill people . . . because the people who are behind it are evil . . . and it pisses me off that we are being manipulated . . . and lied to . . .

(Stern Decl., Ex. C at 41.)  When Ms. O'Connor asked plaintiff, "what people do you think deserve to die from the sins of an evil government?", plaintiff responded "oh I don't know.  But I could probably do some research and hand you a list . . . #1. someone should just shoot down one of the planes . . . this is how my mind works." (Stern Decl., Ex. C at 43.)  When Ms. O'Connor replied, "adam, you are scaring me. what plane???", plaintiff replied "the planes that spray chemicals through the sky . . . that creates this natural weather."  (Stern Decl., Ex. C at 43-44.)

Plaintiff alleges that on or about January 8, 2013, the FBI contacted Bedford Police Chief William Hayes and reported that a female friend of plaintiff's called with concerns about plaintiff's well-being.  (Compl. ¶ 49.)  Chief Hayes contacted Chief Ryan, who had jurisdiction over plaintiff's residence.  (Compl. ¶ 52.)  Members of various law enforcement agencies, including Chiefs Hayes and Ryan, and members of the FBI, met on or about January 8, 2013 for a briefing.  (Compl. ¶ 53.) Dr. Hochman was a participant in the law enforcement briefings.  (Compl. ¶ 54.) Local law enforcement thereafter commenced an investigation in which they

monitored plaintiff's online communications and activities and maintained heightened vigilance at plaintiff's school.  (Compl. ¶ 55.)

On January 10, 2013, plaintiff and Ms. O'Connor discussed the Newtown school shootings in an online chat; plaintiff commented, "the whole thing is a badly acted game."  (Stern Decl., Ex. C at 68.)  Plaintiff went on to state that "there is the 'your neighbor is a violent criminal' agenda and the 'there are terrorists among us' agenda . . . sometimes the shooters are contracted to do it, in which case they are assets to the government, and even when they are not, like today, they still unknowingly put forth either of those two agendas."  (Stern Decl., Ex. C at 69.) When Ms. O'Connor asked "so I am controlled by the government. are you?", plaintiff responded "yes . . . to an extent, its not really the government . . . its entities that came to this planet in order to try to control us . . . I'm working on deprogramming myself. that has been the nightmare of my life."  (Stern Decl., Ex. C at 71.)  Later in the conversation, plaintiff wrote:

> there are a lot of people in this contry [sic] who have done seriously evil things to the masses. one day, someone is going to make a list and go about the task of removing them from power. That will be in the middle of a civil war in America.

(Stern Decl., Ex. C at 81.)  When Ms. O'Connor asked plaintiff whether he would be that person, he responded "i don't know . . . actually, this is not a wise topic of conversation."  (Stern Decl., Ex. C at 82.)  When Ms. O'Connor asked "why isnt [sic] it wise?", plaintiff responded "well, people are crazy . . . because everything we write on this can be recorded and stored . . . and probably is being recorded and stored." (Stern Decl., Ex. C at 83.)

The complaint alleges that on January 18, 2013, Chief Ryan decided that his department would make contact with plaintiff that day when he was on his way home from work and would effect a mental health arrest.  (Compl. ¶ 58.)   That day, police followed plaintiff from work to Precision Armory where he was looking into purchasing a Ruger 10/22, which he had been researching.  (Compl. ¶¶ 60-61.)  Based on the salesperson's indication that the Ruger 10/22 might soon become illegal because it had a ten round magazine, plaintiff decided against purchasing it.  (Compl. ¶¶ 68-69.)  On his way home from Precision Armory, plaintiff alleges that he was pulled over by multiple marked and unmarked police vehicles, including one from the Town of Pound Ridge Police Department.  (Compl. ¶ 72.)  Chief Ryan approached plaintiff's car and told him, in substance, "We know you don't understand what's going on right now, but I need you to cooperate because I'm the only friend you have right now"; Chief Ryan also told plaintiff that if he didn't cooperate, his job and community standing would be jeopardized and he would be compelled to comply in any event.  (Compl. ¶¶ 73-74.)

After the police frisked plaintiff and conducted a consent search of his car, Chief Ryan asked plaintiff if they could go to his house to talk and plaintiff agreed.  (Compl. ¶¶ 76-78.)  Plaintiff alleges that after he and Chief Ryan began speaking in plaintiff's house, Chief Ryan sent officers upstairs to secure plaintiff's firearms and confiscated them without a warrant or plaintiff's consent.  (Compl. ¶¶ 81-82, 84.)  Plaintiff alleges that while searching his home, the officers found tobacco and salt in his dresser and falsely reported that they had found marijuana and a white

crystalline substance that they suspected to be an illicit drug such as methamphetamine or cocaine.  (Compl. ¶ 86.)  Plaintiff alleges that Chief Ryan told him of the alleged FBI informant and their concern about his behavior, including his internet writings and his withdrawal from social activities, and asked questions about his relationships, habits, and illnesses.  (Compl. ¶¶ 88-89.)  Chief Ryan told plaintiff that he wanted plaintiff to go with him to the hospital for an evaluation and said that if he did not agree to go voluntarily, Chief Ryan had the authority to compel him to go involuntarily and would do so.  (Compl. ¶¶ 92-94.)

D.    Plaintiff's Involuntary Commitment

Plaintiff travelled with Chief Ryan to Westchester Medical Center ("WMC") in Valhalla, New York, where he was taken to the Behavioral Health Unit (the psychiatric unit).  (Compl. ¶ 97.)  Plaintiff alleges that Chief Ryan spoke with doctors and hospital staff for about an hour and told them "inflammatory and false information," including that plaintiff had purchased several firearms that day, had made public threats about killing others and had admitted to being severely depressed and suicidal, and that Chief Ryan provided hospital staff with his personal journals.  (Compl. ¶¶ 99-101.)  Plaintiff alleges that Chief Ryan's objective was to persuade the doctors with whom he spoke that plaintiff needed to be involuntarily committed and demanded that they do so.  (Compl. ¶ 105.)  After being interviewed for about 40 minutes by a case manager named Sorin Saladie, plaintiff was admitted to the medical emergency room for tachycardia (i.e. a high pulse).  (Compl. ¶¶ 106-110.)  Plaintiff alleges that Chief Ryan told plaintiff that he was not permitted to leave and warned plaintiff that if he tried to leave he would be

arrested and brought back to the hospital.  (Compl. ¶ 116.)  Plaintiff alleges that Chief Ryan stationed two armed, uniformed police officers outside his hospital room for the first two nights of plaintiff's stay to prevent him from leaving and that the hospital provided staff as protective assistants and stationed them in plaintiff's room for the duration of his admission to the hospital's medical service.  (Compl. ¶¶ 117-18.)  Plaintiff remained in the WMC's medical service until January 23, 2013, at which time he was transferred back to the Behavioral Health Unit and committed by Dr. Susan Kemker; plaintiff remained there until January 30, 2013.  (Compl. ¶¶ 120-27.)  The complaint alleges that Dr. Kemker's decision to commit him was significantly influenced and encouraged by law enforcement, including Chief Ryan.  (Compl. ¶ 124.)    On January 30, 2013, plaintiff met with a number of doctors, including Dr. Nobler; Dr. Nobler met with plaintiff for about an hour, signed off on his discharge that day, and provided him with a letter clearing him to return to work.  (Compl. ¶ 127.)

Chief Ryan arranged with plaintiff's father to pick up plaintiff's firearms to dispose of them through a licensed firearms dealer; plaintiff's father retrieved the firearms from the Pound Ridge Police Department on February 11, 2013 (on the condition that he not return them to plaintiff) and sold them to a firearms dealer the next day.  (Compl. ¶¶ 134-35.)  The complaint alleges that at some point after his firearms were confiscated, Chief Ryan reported to the National Instant Criminal Background Check System ("NICS") that plaintiff had been involuntarily committed

to a psychiatric facility and, as a result, plaintiff may never again legally acquire firearms.  (Compl. ¶ 83.)

     E.    <u>Section 913 Mental Health Evaluation</u>

On January 30, 2013, the day plaintiff was discharged from WMC, law enforcement hand delivered to plaintiff a letter from Dr. Hochman directing plaintiff to appear for a N.Y. Education Law § 913 psychiatric evaluation because a "question has arisen concerning your mental capacity." (Compl. ¶ 135.)  On February 5, 2013, plaintiff emailed Dr. Hochman and attached Dr. Nobler's letter stating that plaintiff was cleared to return to work on February 11, 2013.  (Compl. ¶ 129.)  By letter dated February 7, 2013, Dr. Hochman directed plaintiff to undergo a psychiatric evaluation and take a diagnostic personality evaluation administered by Dr. Lerman.  (Compl. ¶ 136.)  Plaintiff met with Dr. Lerman on April 5, 2013 and May 9, 2013 and was accompanied by his then-attorney, Michael Carr.  (Compl. ¶ 137.)  Plaintiff alleges that Dr. Lerman falsely reported to the District that plaintiff did not cooperate and that plaintiff's non-cooperation precluded him from being able to conclusively diagnose plaintiff.  (Compl. ¶¶ 148-49.)  As noted by the hearing officer at plaintiff's § 3020-a hearing, Dr. Lerman stated in his report to the District that he estimated with 95-100% confidence that plaintiff sought to conceal the true level of his emotional distress during the diagnostic personality test he administered.  (Stern Decl., Ex. B at 22.)  The hearing officer further noted Dr. Lerman's opinion that:

> Mr. Heller appears to be seriously mentally ill, but to have been functioning adequately at work.  He is at high risk of further deterioration, and chronic risk of suicide.  I find no evidence that Mr. Heller represents an acute risk to

the safety of others, but have a low level of confidence in my understanding of this aspect of Mr. Heller's life.

(Stern Decl., Ex. B at 22-23; see Compl. ¶¶ 146-47.)

F.    Section 3020-a Disciplinary Proceeding

By letter dated June 21, 2013, the District filed two disciplinary charges against plaintiff, each containing five specifications, pursuant to N.Y. Education Law § 3020-a.  (Compl. ¶ 150.)  The first charge was for "Misconduct/Conduct Unbecoming a Teacher" relating to plaintiff's failure to cooperate in the District's mental fitness investigation pursuant to § 913.  (Compl. ¶ 151.)  The second charge was for "Incompetence to Work as a Teacher Due to Mental Illness" and alleged that "Due to an apparent mental illness, it would create an undue risk to the safety of the students and faculty of the Bedford Central School District if [plaintiff] were permitted to return to [his] duties."  (Compl. ¶ 154.)  Dr. Hochman recommended a penalty of dismissal in the event that plaintiff failed to request a hearing or if one or more of these charges was sustained.  (Compl. ¶ 156.)  Plaintiff timely requested a hearing, which was presided over by Hearing Officer Jeffrey Sherman.  (Compl. ¶ 157.)  Between December 2, 2013 and February 25, 2014, six witnesses gave testimony over the course of eight days, creating a record consisting of a 1,672 page transcript and approximately 40 exhibits.  (Compl. ¶ 160.)  In plaintiff's closing briefs, he argued that the District's use of the § 3020-a process was an effort to persecute him for his protected speech.  (Stern Decl., Exs. F, G.)

On May 12, 2014, Hearing Officer Sherman issued a decision in which he sustained each charge and specification still pending and imposed the penalty of

discharge.  (Compl. ¶ 161; see Stern Decl., Ex. B.)[3]  In reaching this conclusion, the

hearing officer made, inter alia, the following findings:

- "[T]he Town of Bedford Police Department engaged the Town of Pound Ridge Police Department and, together with the FBI, the New York State Police, and the Joint Terrorism Task Force, effectuated a comprehensive plan to neutralize any potential danger [plaintiff] might present to himself or others, exercising discretion that recognized and respected [plaintiff's] personal, legal, and civil rights.  (Stern Decl., Ex. B at 9-10.)

- The Bedford and Pound Ridge Police Departments "exercised commendable discretion to ensure a safe resolution that respected [plaintiff's] rights and privacy."  (Id. at 10.)

- A medical evaluation composed and signed by Clinician/Case Manager Sorin Saladie from WMC on January 18, 2013, at 9:37 p.m. stated, inter alia, that plaintiff had "overt suspiciousness, paranoia, or persecutory delusions", his judgment was "severely impaired", he had a severe depressed mood, severe psychotic features, and severe suicidal ideations.  The evaluation stated that "[i]f medically cleared, [plaintiff] will need to be admitted involuntarily to an inpatient psychiatric unit here at the Behavioral Health Center, as he is currently a danger to himself and others."  (Id. at 11-14.)

- In signing off on plaintiff's release and his return to work, Dr. Nobler engaged in a "shocking lack of ethics and insight", "failed to comprehend the gravity and consequences of his irrational conduct", and "should have acquired a more thorough understanding of the situation before acting so prematurely."  (Id. at 15.)

- The totality of the record left no doubt that "the entire case and all of its participants, except Dr. Nobler and attorney Carr [who accompanied plaintiff for his § 913 evaluation], acted with the best intentions to protect the safety of everyone in [plaintiff's] world and to provide him with appropriate treatment and care.  Nothing in the record shows ill will toward him or a deliberate intention by anyone to sever his tenure."  (Id. at 17.)

- "Several integrated factors combined to produce the profile of [plaintiff] that caused so much concern about him and for everyone in his

[3] The District had voluntarily dismissed specifications one and two of the first charge on the first day of the hearing.  (Compl. ¶ 153.)

environment.  Suicidal ideation and thoughts of impending doom expressed and implied in Internet instant messages, added to the purchase of guns and ammunition and the possession of hunting knives, a sword, and a bow and arrows, and a credible, albeit anonymous, warning that [plaintiff] presented a potential public hazard, acutely heightened the tension of law enforcement officers and school district administrators, leaving them with no choice but to neutralize the potential public hazard immediately."  (Id. at 23-24.)

- "I understand legal rights, civil rights, and 2nd Amendment rights; I also understand common sense.  Absent myriad complications attached to this case [plaintiff's] arguments are technically reasonable.  He had a right to communicate with friends online, a right to harbor and disseminate critical, even hostile, opinions about the United States Government, a right to buy and own guns and ammunition, and a right to maintain his tenure, but each of those rights was subject to societal and employment rules, mores, and cautions, which is where there appears to be a fundamental disconnect between his position and reality."  (Id. at 31.)

- Plaintiff "had a legal, moral, and ethical obligation to be honest, forthcoming, and cooperative in the investigation into the issues that generated this case.  His obviously premeditated, measured, ill-advised plan to compromise that investigation, in and of itself, constituted sufficient cause to terminate his tenure.  Evidence of serious mental illness, indicating potential danger to himself and others, constituted sufficient cause for the district to pursue action under Section 913 of the New York State Education Law and to terminate his tenure because he failed to comply with the requirements of that law."  (Id. at 31-32.)

- Plaintiff's "defense of his gun and ammunition purchases lacked credibility and rational judgment.  Buying them on the day before and the day of the Sandy Hook Elementary School shooting as a protest against possible 2nd Amendment restrictions is incomprehensible.  He purchased, a 6-shot pump-action 12-gauge shotgun and a 5-shot bolt-action high-powered military rifle, neither of which is the target of much concern by anti-gun activists, but both guns are lethal weapons that pose extreme danger in the hands of malicious antagonists."  (Id. at 32.)

- "The Bedford Central School [D]istrict complied with every aspect of its lawful, ethical, moral, and humanistic responsibility to [plaintiff].  Unfortunately, [plaintiff], apparently motivated by false empowerment from bad guidance, thwarted every effort to resolve the issues that threatened his tenure."  (Id. at 33.)

14

- Plaintiff "foreclosed the district's rational approach to protect his tenure, address the issues that troubled him, and ensure his wellbeing and that of Fox Lane High School, Bedford Central School District, and the community at large."  (Id. at 33.)

G.    State Court Litigation

Plaintiff appealed the hearing officer's decision to the New York State Supreme Court, Westchester County, which affirmed plaintiff's termination on October 2, 2014.  (Compl. ¶¶ 162-63; see Stern Decl., Ex. E.)  Plaintiff appealed the Supreme Court's decision to the New York State Appellate Division, Second Department; that appeal remains pending.  (Compl. ¶ 164.)

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on January 30, 2015, alleging eleven causes of action, including eight claims under § 1983 based on violations of his First, Second, Fourth, and Fourteenth Amendment rights, and three malpractice claims sounding in negligence that arise under New York law.  (Compl. ¶¶ 171-341.)[4] Plaintiff's First Amendment claims allege that the District and Dr. Hochman retaliated against his protected speech—consisting of his online conversations with Ms. O'Connor and his allegedly expressive purchase of firearms—by recommending that he undergo a mental health evaluation, be charged with misconduct and incompetence, and that his employment be terminated; the complaint also alleges

---

[4] The complaint alleges malpractice claims against WMC and Drs. Kemker and Lerman (Compl. ¶¶ 263-281, 314-338); as noted above, plaintiff has dismissed his claim against Dr. Lerman without prejudice (see April 28, 2015 Minute Entry).  Because neither Dr. Kemker nor WMC moved to dismiss the complaint, these malpractice claims are not at issue in the pending motions, nor is plaintiff's Fourteenth Amendment claim alleging that WMC violated his procedural due process rights by continuing his involuntary commitment past January 25, 2013 in violation of N.Y. Mental Hygiene Law § 9.39(a).  (See Compl. ¶¶ 253-62.)  The Court therefore does not address these claims further.

15

that the District, Dr. Hochman, the Town and Chief Ryan conspired to retaliate against plaintiff's protected speech by agreeing to investigate, arrest, unlawfully detain, involuntarily commit, and terminate him without any reasonable legitimate basis to do so.  (Compl. ¶¶ 282-313.)  Plaintiff's Fourth Amendment claims allege that the Town and Chief Ryan falsely arrested him without probable cause when Chief Ryan effected a mental health arrest on January 18, 2013; that the Town, Chief Ryan and WMC falsely arrested plaintiff by preventing him from leaving the WMC medical services area between January 18, 2013 and January 23, 2013; and that Dr. Kemker, WMC, Chief Ryan and the Town unlawfully seized plaintiff (and conspired to and did violate his substantive due process rights under the Fourteenth Amendment) when he was involuntarily committed to WMC's psychiatric unit from January 23, 2013 to January 30, 2013.  (Compl. ¶¶ 171-252.) As to plaintiff's Second Amendment claim, he alleges that all defendants engaged in misconduct that led plaintiff to be unlawfully denied his legally obtained firearms and the right to legally obtain others.  (Compl. ¶¶ 339-41.)[5]

On March 4, 2015, Dr. Kemker filed an answer (ECF No. 5), and WMC did so on April 28, 2015 (ECF No. 30).  Following a pre-motion conference held on April 28, 2015, in which plaintiff agreed to voluntarily dismiss his claim against Dr. Lerman without prejudice, the remaining defendants moved to dismiss the complaint on June 15, 2015.  (ECF Nos. 32, 35.)  Those motions became fully briefed on August 7,

---

[5] In his opposition to the District's and Dr. Hochman's motion to dismiss, plaintiff clarified that he does not assert a Second Amendment claim against those defendants.  (Mem. of Law in Opp. to School District Defendants' Motion to Dismiss at 1 n.1, ECF No. 41.)  Plaintiff's eleventh claim is thus dismissed as to those defendants to the extent that the claim appears to be asserted against them on the face of the complaint.

2015.  (ECF Nos. 43, 44.)  On October 22, 2015, this action was transferred to the undersigned.

## III.   MOTION TO DISMISS STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  Id.  The Court will give "no effect to legal conclusions couched as factual allegations."  Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant."  Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010).  But, if the Court can infer

no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate.  <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 556 U.S. at 679).  As discussed above, where necessary, the Court may supplement the allegations in the complaint with facts from documents either referenced therein or relied upon in framing the complaint.  <u>See</u> <u>DiFolco</u>, 622 F.3d at 111.

## IV.  DISCUSSION

In resolving defendants' motions, the Court considers plaintiff's claims in the following order: (1) the First Amendment retaliation claims, (2) the Fourth Amendment false arrest and unlawful seizure claims, (3) the Fourteenth Amendment substantive due process claims, (4) the Second Amendment claim, and (5) the § 1983 conspiracy claims (to the extent not resolved by the Court's discussion in prior sections).  The Court ultimately concludes that all of these claims are subject to dismissal on one or more grounds.

### A.  <u>First Amendment Retaliation Claims</u>

Plaintiff alleges that defendants violated his First Amendment rights because the District and Dr. Hochman retaliated against him (and conspired to retaliate against him with the Town and Chief Ryan) for his protected speech and expressive conduct when they, ordered him to undergo a psychiatric evaluation, charged him with misconduct and recommended that his employment be terminated.  (Compl. ¶¶ 282-313.)  Defendants raise several grounds for dismissal of these claims, including that they are barred by the <u>Rooker-Feldman</u> doctrine,

18

precluded by collateral estoppel, and are implausible; they also argue that Dr. Hochman is, at the very least, entitled to qualified immunity.  For the reasons set forth below, the Court concludes that while the <u>Rooker-Feldman</u> doctrine and collateral estoppel do not bar plaintiff's claims, these claims are nonetheless subject to dismissal because they are implausible, and also should be dismissed against Dr. Hochman on the basis of qualified immunity.

       1.    <u>Rooker-Feldman</u>

"Under the <u>Rooker-Feldman</u> doctrine, federal district courts lack jurisdiction over cases that essentially amount to appeals of state court judgments." <u>Vossbrinck v. Accredited Home Lenders, Inc.</u>, 773 F.3d 423, 426 (2d Cir. 2014); <u>see</u> <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005).  "The doctrine is rooted in the principle that appellate jurisdiction to reverse or modify a state-court judgment is lodged . . . exclusively in the Supreme Court." <u>Vossbrinck</u>, 773 F.3d at 426 (quotation marks and alterations omitted); <u>see</u> 28 U.S.C. § 1257.  The doctrine bars federal district court jurisdiction where: "(1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites . . . review and rejection of that judgment; and (4) the state judgment was rendered before the district court proceedings commenced." <u>Vossbrinck</u>, 773 F.3d at 426 (citing <u>Hoblock v. Albany Cnty. Bd. of Elecs.</u>, 422 F.3d 77, 85 (2d Cir. 2005)) (quotation marks and alterations omitted).  Elaborating on the second prong, the Second Circuit has provided the following guidance:

> [A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified,

acquiesced in, or left unpunished by it.  Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear.

Hoblock, 422 F.3d at 88.  Application of Rooker-Feldman thus "turns not on the similarity between a party's state-court and federal-court claims . . . but rather on the causal relationship between the state-court judgment and the injury of which the party complains in federal court." MicKithen v. Brown, 481 F.3d 89, 98 (2d Cir. 2007) (emphasis in original).  "A party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed prior in time to the state-court proceedings and so could not have been 'caused by' those proceedings." Id. (emphasis in original).

Plaintiff alleges that the District and Dr. Hochman retaliated against him (and conspired with the Town and Chief Ryan to retaliate against him) for his protected First Amendment activities when they mandated that he undergo a § 913 evaluation, charged him with misconduct and recommended that his employment be terminated.  (Compl. ¶¶ 282-313.)[6]  The District's disciplinary charges were sustained, and the penalty of discharge ultimately imposed, by a hearing officer following plaintiff's § 3020-a hearing, a decision that was affirmed by the New York State Supreme Court.  (Compl. ¶¶ 161, 163.)  Defendants contend that plaintiff's

---

[6] To the extent that plaintiff argues that his mental health arrest by Chief Ryan and involuntary commitment at WMC were additional actions taken in retaliation for his speech, those claims are barred by the existence of probable cause, which is a complete defense to a retaliatory arrest claim. Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government.").  As set forth below, plaintiff's seizures were supported by probable cause.  As a result, no First Amendment retaliation claim may lie against defendants on that basis.

First Amendment claims are in essence an attempt to reverse the New York court's decision.  While defendants have undoubtedly met the first and fourth prongs of <u>Rooker-Feldman</u>, the Court concludes that <u>Rooker-Feldman</u> does not bar plaintiff's claims because the second prong is not satisfied.

The second <u>Rooker-Feldman</u> prong turns on whether plaintiff's alleged injuries were <u>caused by</u> the New York court's judgment.  While plaintiff does seek an outcome that would, to a certain extent, be inconsistent with the state court's affirmance of the hearing officer's decision, the state court did not cause plaintiff's termination—the hearing officer did.[7]  A hearing officer's decision pursuant to a § 3020-a proceeding, which falls under the authority of the New York State Education Department, is not a state court judgment subject to <u>Rooker-Feldman</u>'s jurisdictional bar.  <u>Palkovic v. Johnson</u>, 451 F. Supp. 2d 448, 454 (N.D.N.Y. 2006) (concluding that teacher's challenge to § 3020-a proceeding was not barred by <u>Rooker-Feldman</u> because the decision was rendered by a state administrative agency, not a state court), <u>vacated on other grounds by</u>, 281 F. App'x 63 (2d Cir. 2008) (summary order); <u>see also</u> <u>Verizon Maryland, Inc. v. Public Service Comm'n of Md.</u>, 535 U.S. 635, 644 n.3 (2002) ("The [<u>Rooker-Feldman</u>] doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency.").[8]  The fact that the New York court declined to

---

[7] Plaintiff's alleged injuries of having to undergo a psychiatric evaluation and having disciplinary charges filed against him are even more attenuated from the state court judgment.

[8] The Second Circuit's decision in <u>Mitchell v. Fishbein</u>, 377 F.3d 157 (2d Cir. 2004), was not to the contrary.  In <u>Mitchell</u>, the Second Circuit stated that while <u>Rooker-Feldman</u> does not generally preclude district court review of state administrative agency decisions, <u>Rooker-Feldman</u> does apply when those agencies are appropriately characterized as arms of the state judiciary <u>qua</u> judiciary.

vacate the result of the § 3020-a proceeding does not mean that the injury of which plaintiff complains was caused by the state court's decision itself.  See Hoblock, 422 F.3d at 88 (Rooker-Feldman applies "when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.").  The injuries of which plaintiff complains preceded the state court action. Rooker-Feldman does not deprive a federal court of jurisdiction merely because the plaintiff seeks a legal conclusion different from that reached by the state court; as discussed below, such a situation instead raises potential application of claim and/or issue preclusion.  See Exxon Mobil Corp., 544 U.S. at 293.

> ### 2.    Collateral Estoppel

Defendants argue that even if Rooker-Feldman does not serve as a jurisdictional bar, plaintiff's First Amendment retaliation claims are nonetheless precluded under principles of collateral estoppel.  "Collateral estoppel, or issue preclusion, precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same."  Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000) (quotation marks omitted).  State court judgments receive the same preclusive effect in federal court as they would be given in the courts of the state itself.  West v. Ruff, 961 F.2d 1064, 1065 (2d Cir. 1992). Under New York law, a hearing officer's factual findings pursuant to a § 3020-a

---

377 F.3d at 166; see also Redlich v. Ochs, No. 1:10-cv-570 (GLS/RFT), 2011 WL 754028, at *6 (N.D.N.Y. Feb. 24, 2011) (same).  Mitchell was not addressing the factual circumstances at issue here, in which the state administrative body was an arm of a state executive agency, rather than the state judiciary.

proceeding are given preclusive effect where the parties have had a full and fair opportunity to be heard.  Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 311-12 (2d Cir. 2005); see also Jenkins v. N.Y.C. Dep't of Educ., No. 10 CV 6159(BSJ)(THK), 2011 WL 5451711, at *3 (S.D.N.Y. Nov. 9, 2011) (citing In re Czosek, 71 A.D.3d 1359, 1360 (3d Dep't 2010)).  Under New York law, collateral estoppel may apply to an administrative agency's quasi-judicial determination when two conditions are satisfied: "(1) the issue sought to be precluded is identical to a material issue necessarily decided by the administrative agency in a prior proceeding; and (2) there was a full and fair opportunity to contest this issue in the administrative tribunal."  Jeffreys v. Griffin, 1 N.Y.3d 34, 39 (2003); see also Sullivan, 225 F.3d at 166.  Among the factors relevant to whether a party had a full and fair opportunity to contest an issue in the prior litigation are: "the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, [and] the competence and expertise of counsel."  Hickerson v. City of New York, 146 F.3d 99, 109 (2d Cir. 1998) (quoting Ryan v. New York Tel. Co., 62 N.Y.2d 494, 501 (1984)).  Even when the requirements of collateral estoppel are satisfied, application of the doctrine is discretionary—it "'is grounded on concepts of fairness and should not be rigidly or mechanically applied.'"  In re Sokol, 113 F.3d 303, 306 (2d Cir. 1997) (quoting D'Arata v. New York Central Mutual Fire Ins. Co., 76 N.Y.2d 659, 664 (1990)).

The Court begins by considering whether issues necessary to the hearing officer's decision in the § 3020-a proceeding are identical to those arising from plaintiff's relevant claims here.  As set forth below, the Court concludes that while material identical issues were <u>raised</u> in both proceedings, resolution of those issues was not <u>necessary</u> to the hearing officer's decision; collateral estoppel, therefore, does not apply.

Defendants argue that plaintiff's retaliation claims are precluded by collateral estoppel because the § 3020-a hearing officer determined that defendants' actions were motivated by legitimate reasons, rather than a desire to chill protected speech.  <u>See</u> <u>Anemone v. Metro. Transp. Auth.</u>, 629 F.3d 97, 114 (2d Cir. 2011) (A First Amendment retaliation claim requires a causal connection between plaintiff's protected speech and an adverse employment action, meaning that plaintiff's speech played an improper motive in defendants' actions).  The purpose of plaintiff's § 3020-a proceeding was to determine whether the District's two charges against plaintiff were supported by a preponderance of the evidence and, if so, whether to adopt Dr. Hochman's recommended penalty of dismissal.  The District's two charges were for "Misconduct/Conduct Unbecoming a Teacher" based on plaintiff's failure to cooperate in the § 913 evaluation mandated by the District, and "Incompetence to Work as a Teacher Due to Mental Illness" based on an "apparent mental illness [that] would create an undue risk to the safety of the students and faculty of the [District]" if plaintiff were permitted to return to his duties.  (Compl. ¶¶ 151, 154.)

24

The hearing officer ultimately sustained both charges.  Specifically, he sustained specifications 3, 4 and 5 of the first charge, which stated that plaintiff intentionally made false statements to Dr. Lerman during his examinations on April 5, 2013 and May 9, 2013, intentionally gave false answers to a significant number of questions when he took the diagnostic personality test administered by Dr. Lerman, and failed to cooperate with Dr. Lerman causing him to be unable to determine the degree to which plaintiff represented a risk to others, thereby frustrating the purpose of the § 913 examination.  (Compl. ¶ 152; Stern Decl., Ex. B at 33.)  The hearing officer also sustained specifications 1 through 5 of the second charge, which stated, <u>inter alia</u>, that Dr. Lerman concluded that plaintiff likely suffered from serious mental illness with a risk of further deterioration and possible suicide and with the possibility of an acute risk to the safety of others, Dr. Lerman concluded that plaintiff failed to cooperate in his treatment efforts and would likely continue to do so, and there was a risk, based on plaintiff's online communications, that plaintiff may someday believe himself compelled to commit acts similar to the school shootings in Newtown, Connecticut.  (Compl. ¶ 152; Stern Decl., Ex. B at 33.) The hearing officer found that "[e]vidence of serious mental illness, indicating potential danger to himself and others, constituted sufficient cause for the district to pursue action under Section 913 of the New York State Education Law and to terminate his tenure because he failed to comply with the requirements of that law"; the hearing officer also concluded that the District "complied with every

aspect of its lawful, ethical, moral, and humanistic responsibility" to plaintiff. (Stern Decl., Ex. B at 32-33.)

The hearing officer thus found that defendants' actions and plaintiff's discharge were justified by the reasons proffered by the District.  He explicitly found that defendants complied with the law and were motivated by legitimate reasons in taking actions adverse to plaintiff's employment.  Those conclusions, however, were not <u>necessary</u> to resolution of the matter before the hearing officer, which simply required that he determine whether the charges were justified by a preponderance of the evidence.  <u>E.g.</u>, <u>Beechwood Restorative Care Center v. Leeds</u>, 436 F.3d 147, 152-53 (2d Cir. 2006) ("[A] plaintiff can prove First Amendment retaliation even if the measures taken by the state were otherwise justified . . . . The charges . . . might have been sustainable even if they were animated by bias and retaliation."); <u>Latino Officers Ass'n v. City of New York</u>, 253 F. Supp. 2d 771, 786 (S.D.N.Y. 2003) ("The Article 78 court's finding that [plaintiff's] termination was rational is not inconsistent with a finding that it was motivated in some part or caused by his exercise of First Amendment rights.").  While the hearing officer's discussion of defendants' motive was relevant to his finding that the District's evidence in support of the charges was credible, it is not at all clear that his determination that defendants' motives were lawful was "so influential as to be actually decisive of the ultimate question" at issue.  <u>Beechwood</u>, 436 F.3d at 153. "Indeed, plaintiff could have engaged in misconduct which justified his termination, and defendants' actions may still have been substantially motivated by plaintiff's

First Amendment activity." <u>Morey v. Somers Cent. Sch. Dist.</u>, No. 06 Civ.

1877(WCC), 2007 WL 867203, at *7 (S.D.N.Y. Mar. 21, 2007).  Because the only

findings made by the hearing officer that would actually be inconsistent with a

finding of liability in this case were not necessary to the hearing officer's decision,

collateral estoppel does not preclude plaintiff's claims.[9]

       3.   <u>Plausibility</u>

Defendants next argue that plaintiff's First Amendment retaliation claims

fail because his allegations are implausible.  "To state a prima facie claim of First

Amendment retaliation under Section 1983, [a plaintiff] must offer some tangible

proof that 1) her speech was constitutionally protected; 2) she suffered an adverse

employment action; and 3) a causal relationship between the two existed in that the

speech was a substantial or motivating factor for the adverse employment action."

<u>Burkybile</u>, 411 F.3d at 313.  The First Amendment confers protection on

government employee speech made "'as a citizen addressing matters of public

concern.'"  <u>Weintraub v. Bd. of Educ.</u>, 593 F.3d 196, 200 (2d Cir. 2010) (quoting

<u>Garcetti v. Ceballos</u>, 547 U.S. 410, 417 (2006)).  Speech addresses a matter of public

concern when it may be "'fairly considered as relating to any matter of political,

social, or other concern to the community.'"  <u>Wrobel v. Cnty. of Erie</u>, 692 F.3d 22, 28

(2d Cir. 2012) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)).  The First

Amendment, however, "permits restrictions upon the content of speech in a few

limited areas, which are of such slight social value as a step to truth that any

---

[9] In light of the Court's decision, the Court declines to reach the issue whether plaintiff had a full and fair opportunity to litigate the First Amendment retaliation issues in the state proceedings.

benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Virginia v. Black, 538 U.S. 343, 358-59 (2003).

Plaintiff claims that he engaged in two sorts of protected expression: (1) his private, online conversations with Ms. O'Connor, and (2) his purchase of firearms, which plaintiff asserts amounts to a "symbolic gesture in support of the Second Amendment." (Mem. of Law in Opp. to School District Defendants' Motion to Dismiss at 18-19.) As set forth below, this argument fails both because plaintiff has not plausibly shown that his speech or expressive conduct is entitled to protection from employer retaliation under the First Amendment, and his speech does not otherwise withstand the defense established in Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

At the outset, the Court easily rejects plaintiff's assertion that his purchase of firearms constituted protected symbolic conduct. Plaintiff does not plausibly allege—under the standards set forth in Twombly and Iqbal—that his purchase of firearms was "intended to be communicative and that, in context, [it] would reasonably be understood by the viewer to be communicative." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 294 (1984); see also Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) ("In determining whether particular conduct is sufficiently expressive to implicate the First Amendment . . . the test is whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." (quotation marks and alterations omitted)).

28

The complaint does not contain any plausible, non-conclusory allegation to support plaintiff's claim that he purchased firearms with a communicative intent or that any observer would have reasonably understood his purchase of firearms to convey a particularized message.  (See Compl. ¶¶ 28-40.)

As to plaintiff's online conversations, the Court concludes that, based on the overall factual allegations of the complaint and the materials incorporated therein, plaintiff's speech amounts to a "true threat" not entitled to First Amendment protection.  Black, 538 U.S. at 359 ("'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.  The speaker need not actually intend to carry out the threat." (citations omitted)); see also United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013) (stating that test for whether conduct amounts to a true threat "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury" (quotation marks and alterations omitted)).  Here, plaintiff allegedly stated a desire to kill people and shoot down a plane and told Ms. O'Connor that he could do some research and hand her a list of who deserves to die, all in the context of explaining his belief that certain individuals in power (or entities originating from beyond this planet) controlled the mind of the individual responsible for the school shootings in Newtown, Connecticut (and were trying to control his mind), and caused Hurricane Sandy and other weather events.  (Stern Decl., Ex. C at 41-44.)  The appropriate

29

context in which to view plaintiff's speech is that he spoke as a highly delusional, unstable and paranoid individual who had recently purchased several firearms, and whose speech was reported to law enforcement by an anonymous friend concerned with plaintiff's well-being.  Under those circumstances, which are referenced in the complaint itself, and are thoroughly documented and supported in the records of plaintiff's § 3020-a hearing and the succeeding state court proceedings, plaintiff has failed to plausibly show that his speech is entitled to First Amendment protection.[10]

Even if plaintiff's speech is entitled to <u>some</u> degree of First Amendment protection, plaintiff has not plausibly shown that his speech touched on a matter of public concern—as opposed to itself being a cause for public concern—such that his speech is entitled to protection from public employer retaliation.  <u>See</u> <u>Weintraub</u>, 593 F.3d at 200.  To determine whether speech is of public concern, a court must "examine the content, form, and context of that speech, as revealed by the whole record."  <u>Snyder v. Phelps</u>, 562 U.S. 443, 453 (2011) (quotation marks omitted)).  While speech that involves government criticism and addresses other political and social issues does, in general, touch on a matter of public concern regardless of the views expressed or positions advocated, <u>see</u> <u>Jeffries v. Harleston</u>, 21 F.3d 1238, 1245-46 (2d Cir.), <u>vacated on other grounds</u>, 513 U.S. 996 (1994) ("First Amendment protection does not hinge on the palatability of the presentation; it extends to all speech on public matters, no matter how vulgar or misguided."), and speech made in a private forum may qualify for protection in some circumstances, <u>see</u> <u>Givhan v. W.</u>

---

[10] The Court notes that, as with its other determinations as to the sufficiency of the pleadings which are set forth below, the Court is reviewing the allegations at the pleading stage and as such is not purporting to make any findings of fact.

<u>Line Consol. Sch. Dist.</u>, 439 U.S. 410, 414-16 (1979); <u>Jackler v. Byrne</u>, 658 F.3d 225, 235-36 (2d Cir. 2011); <u>but see</u> <u>Wu v. Metro-North Commuter R.R.</u>, No. 14CV7015–LTS–FM, 2015 WL 5567043, at *6 (S.D.N.Y. Sept. 22, 2015) ("[T]he Court notes that Plaintiff's transmission of these complaints through private, internal mechanisms seems unlikely to have been calculated to alert the general citizenry to a matter of public concern."), when plaintiff's speech is viewed as a whole within the context in which it was allegedly made, it was so far-flung, far-fetched and delusional that it fails to plausibly address a matter of public concern under the standards of <u>Twombly</u> and <u>Iqbal</u>.  Delusional theories that the government is engaged in a conspiracy to cause hurricanes and other natural disasters, and that entities came to this planet to try to control humans and make them carry out acts such as the school shooting in Newtown, Connecticut, do not touch on matters of public concern (though such statements may be publicly concerning).  Plaintiff thus does not state a plausible prima facie retaliation claim.

Finally, even if plaintiff's online communications constituted speech entitled to protection from employer retaliation, plaintiff's claims are nonetheless subject to dismissal under the <u>Pickering</u> balancing test.  The <u>Pickering</u> test is based on the principle that "'[g]overnment employers, like private employers, need a significant degree of control over their employers' words and actions' in order that employees not 'contravene governmental policies or impair the proper performance of governmental functions.'" <u>Jackler</u>, 658 F.3d at 234 (quoting <u>Garcetti</u>, 547 U.S. at 418, 419).  <u>Pickering</u> applies when three elements are satisfied: "(1) the employer's

prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." Anemone, 629 F.3d at 115; see Pickering, 391 U.S. at 568.  Only the potential for disruption, rather than a showing of actual disruptiveness, is required.  Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995).  The Pickering test is a question of law for the Court to decide.  Lewis v. Cowen, 165 F.3d 154, 164 (2d Cir. 1999).  Although "the government is more likely to meet its burden when an employee's disruptive activity occurs in the workplace than when the equivalent activity occurs on an employee's own time, away from work," the defense may apply even when the relevant First Amendment activities occur outside the workplace and are largely unconnected to it.  Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York, 336 F.3d 185, 194, 197 (2d Cir. 2003).

Weighing the likelihood of potential disruption against the value of plaintiff's speech, the Court concludes that defendants have easily met their burden under the Pickering test as a matter of law.  A review of the totality of allegations concerning plaintiff's online communications and other conduct demonstrates that plaintiff's speech would have certainly alarmed students and parents and disrupted plaintiff's classroom, the school, and the District, if his activities had become widely known while plaintiff was still employed as a teacher.  See Melzer, 336 F.3d at 198-99 (2d Cir. 2003) (noting that "by its very nature [the position of a public school teacher] requires a degree of public trust not found in many other positions of public

employment" and finding school's discharge of a teacher proper under Pickering where teacher advocated changes in the law that would accommodate his professed desire to have sexual relationships with adolescent boys).

Of particular concern were plaintiff's comments that he had a desire to kill people and shoot down a plane, he could make a list of people who deserved to die, and he believed that the school shootings in Newtown, Connecticut, were caused by the government controlling the shooter's mind and expressed concern that his own mind was being controlled by forces that came to this planet to try to control people. (Stern Decl., Ex. C at 41-44, 68-71.)

These alleged statements, if shared with students, parents and/or fellow school employees, would have caused substantial (and well-justified) disruption that far exceeded the value of plaintiff's delusional, paranoid and far-fetched conspiracy theories.[11]  It is implausible based on the allegations, furthermore, to believe that defendants were motivated by an improper retaliatory motive rather than by concerns about plaintiff's mental health and the risks that he posed to the school and the community.  Because plaintiff has not plausibly shown that his speech was entitled to protection from employer retaliation and the likelihood of potential disruption that would be caused by his speech far outweighed its value, plaintiff's

---

[11] To the extent that plaintiff argues that his speech was made as part of a private conversation not intended for wider public dissemination, that further undermines his claim that his speech touched on a matter of public concern.  As plaintiff's concerning behavior was reported to law enforcement, and in light of the evidence of plaintiff's deteriorating mental state, it is also implausible that this information would have evaded public knowledge indefinitely.

First Amendment retaliation claim and related conspiracy claim are hereby dismissed.[12]

      4.    <u>Qualified Immunity</u>

Defendants argue that even if plaintiff has sufficiently alleged a First Amendment retaliation claim, Dr. Hochman should be dismissed from the suit on the basis of qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Qualified immunity should be decided at the earliest possible stage in litigation.  <u>Id.</u> at 232; <u>see also</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations

---

[12] Defendants also argue that these claims should be dismissed under the <u>Mt. Healthy</u> defense, pursuant to which a government employer may escape liability if it can demonstrate that it would have taken the same adverse actions even absent the plaintiff's protected speech. <u>Mt. Healthy Sch. Dist. Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 285-86 (1977); <u>Anemone</u>, 629 F.3d at 114-15.  Given that this defense normally involves an "issue of hypothetical causation [that] requires fact-finding," <u>Sher v. Coughlin</u>, 739 F.2d 77, 82 (2d Cir. 1984), the Court declines to rule on this alternative ground in light of the Court's other reasons for dismissal.

omitted).  While there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate."  Id.

Even if plaintiff's First Amendment retaliation claims otherwise pass muster, the Court agrees that Dr. Hochman is entitled to qualified immunity.  Plaintiff has failed to show any authority amounting to clearly established law that a school district superintendent acts improperly by mandating that a teacher undergo a § 913 mental health evaluation in response to that teacher's bizarre, delusional and potentially homicidal statements made contemporaneously with that teacher's sudden purchase of several firearms and accompanied by a specific call explaining a concern regarding the teacher's well-being.  Plaintiff has also failed to point to any clearly established law showing that a school district superintendent acts unlawfully by filing disciplinary charges after a medical doctor reports that such teacher failed to cooperate with the § 913 examination, precluding the doctor from making an accurate determination of the extent of plaintiff's mental illness.  At the very least, it was certainly objectively reasonable for Dr. Hochman to believe that such conduct fully complied with the law.  Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010).[13]  Plaintiff's claims for damages against Dr. Hochman in his personal capacity are thus independently subject to dismissal.

---

[13] While not dispositive here, the Court also notes that neither the hearing officer nor the New York State Supreme Court found that Dr. Hochman acted improperly in any way.  This lends at least some support to the determination that Dr. Hochman acted reasonably.  See Allen v. Coughlin, 64 F.3d 77, 81 (2d Cir. 1995) (granting qualified immunity because defendants could not have been expected to be more prescient on the validity of a regulation than the New York State Appellate Division).

B.  <u>Fourth Amendment Claims</u>

Defendants raise several grounds for dismissal of plaintiff's Fourth Amendment claims, including that (1) plaintiff's arrest/seizures were supported by probable cause, (2) Chief Ryan is entitled to qualified immunity, and (3) plaintiff fails to state a viable claim for municipal liability against the Town.  As set forth below, the Court finds merit in each of these arguments.

1.  <u>Probable Cause</u>

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." <u>Wevant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).  Under New York law, a plaintiff claiming false arrest must prove four elements: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 19 (2d Cir. 2012) (citing <u>Broughton v. New York</u>, 335 N.E.2d 310, 314 (N.Y. 1975)).[14]

_____

[14] Although defendants state that plaintiff's Fourth Amendment claim "fails both because he consented to the confinement and the confinement was privileged", (Mem. of Law in Support of Defendants Town of Pound Ridge and David Ryan's Motion to Dismiss at 11, ECF No. 37), their argument primarily focuses on the fourth prong (i.e. whether plaintiff's seizure was privileged because it was supported by probable cause).  Because the Court concludes that the seizures were privileged, the Court need not address defendants' alternative ground that plaintiff voluntarily consented to them.  The Court notes that defendants appear to primarily rely on the hearing officer's findings that plaintiff gave consent to the search of his car and home (Stern Decl., Ex. B at 6-7), but the Court concludes that the issue of plaintiff's consent to the seizures appears to be a contested factual question that need not be here addressed.

New York law provides that a police officer "may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41.[15]  The statute defines the phrase "likely to result in serious harm" as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is a danger to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01.  Probable cause to believe that the criteria for a mental health arrest pursuant to N.Y. Mental Hyg. Law § 9.41 have been met is a defense to a false arrest claim arising from such an arrest.  Kerman v. City of New York, 261 F.3d 229, 235 n.8 (2d Cir. 2001) ("We interpret [N.Y. Mental Hyg. Law § 9.41] consistently with the requirements of the Fourth Amendment and therefore assume that the same objective reasonableness standard is applied to police discretion under this section."); Tsesarskaya v. City of New York, 843 F. Supp. 2d 446, 455-56 (S.D.N.Y. 2012); see also Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997) ("The Fourth Amendment requires an official seizing and detaining a

---

[15] Mental Hygiene Law § 9.59 provides that police officers who effect a mental health arrest are immune from suits arising from such seizures, unless the seizure resulted from gross negligence. N.Y. Mental Hyg. Law § 9.59.  Sections 9.39 and 9.40 also provide that hospitals may receive and retain an individual for a period of fifteen days under the same standard set forth in § 9.41.  N.Y. Mental Hyg. Law §§ 9.39, 9.40.  The Second Circuit has stated that "a doctor will not be held liable under § 1983 for the treatment decisions she makes unless such decisions are such a substantial departure from accepted judgment, practice, or standards as to demonstrate that she actually did not base the decision on such a judgment."  Kulak v. City of New York, 88 F.3d 63, 75 (2d Cir. 1996) (quotation marks and alterations omitted).  Plaintiff alleges that he was kept at WMC from January 18, 2013 until January 30, 2013, a total of less than fifteen days.

person for a psychiatric evaluation to have probable cause to believe that the person

is dangerous to himself or others."). Courts have held that "a showing of probable

cause in the mental health seizure context requires only a probability or substantial

change of dangerous behavior, not an actual showing of such behavior." <u>Monday</u>,

118 F.3d at 1102; <u>see</u> <u>Dunkelberger v. Dunkelberger</u>, No. 14–CV–3877 (KMK), 2015

WL 5730605, at *12 (S.D.N.Y. Sept. 30, 2015). The reasonableness of an officer's

belief must be assessed in light of the particular circumstances confronting the

officer at the time. <u>Kerman</u>, 261 F.3d at 235.

Plaintiff alleges that he was unlawfully seized when: (1) Chief Ryan directed

plaintiff to accompany him to WMC on January 18, 2013, (2) the Town, Chief Ryan

and WMC prevented plaintiff from leaving the WMC medical services area between

January 18, 2013 and January 23, 2013, and (3) Dr. Kemker, WMC, Chief Ryan and

the Town involuntarily committed plaintiff to WMC's Behavioral Health Unit

between January 23, 2013 and January 30, 2013. (Compl. ¶¶ 171-252.)[16] The

Court concludes that, based on the allegations in the complaint and the materials

incorporated into the complaint, these seizures were privileged because they were

supported by probable cause. According to the complaint, on or about January 8,

2013, the FBI contacted Bedford Police Chief William Hayes, who in turn contacted

Chief Ryan, stating that an anonymous female friend of plaintiff's had called with

---

[16] In his opposition to defendants' motion, plaintiff claims that he only asserts two false arrest claims, the first arising from his initial seizure on January 18, 2013, and the second arising from his detention in WMC's medical service between January 18, 2013 and January 23, 2013. (Mem. of Law in Opp. to Town Defendants' Motion to Dismiss at 5, ECF No. 40.) This assertion, however, mischaracterizes plaintiff's third claim, which alleges an unlawful seizure and violation of substantive due process under the Fourth and Fourteenth Amendments arising from plaintiff's involuntary commitment in WMC's Behavioral Health Unit.

concerns about his well-being.  (Compl. ¶¶ 49, 52.)  Although the complaint alleges

that no anonymous informant actually existed, Chief Ryan was entitled to rely on

the allegations of fellow law enforcement officers that such an informant did exist

when making his probable cause determination.  Panetta v. Crowley, 460 F.3d 388,

395 (2d Cir. 2006).  The complaint does not allege that the officers relied on this

anonymous tip in isolation; it alleges that law enforcement subsequently monitored

plaintiff's online communications.  (Compl. ¶¶ 55-56.)  The police were thus privy to

plaintiff's online conversation with Ms. O'Connor—which the Court has determined

is incorporated by reference into the complaint—in which plaintiff made bizarre,

delusional and potentially homicidal statements including, inter alia, that he had a

desire to kill people and shoot down a plane, he could make a list of people who

deserved to die, and he believed that the school shootings in Newtown, Connecticut,

were caused by the government controlling the shooter's mind and expressed

concern that his own mind was being controlled by entities that came to this planet

to try to control people.  (Stern Decl., Ex. C at 41-44, 68-71.)   Despite plaintiff's

contention that when read in context his dialogue with Ms. O'Connor was benign

and does not demonstrate that he posed a substantial threat of danger to himself or

others, that claim is belied by the content of the conversation, which the Court has

carefully reviewed.  Adding to their cause for concern that plaintiff could be a

danger to himself or others, the police, moreover, had learned that plaintiff had

recently begun purchasing firearms and was interested in acquiring more, including

on January 18, 2013, the day that Chief Ryan made contact with plaintiff and effected a mental health arrest.  (Compl. ¶¶ 28-40, 60-62, 94-95.)

Based on the totality of the facts and circumstances alleged to have been known to officers at the time of plaintiff's mental health arrest, Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013), the above information was sufficient to establish a probability that plaintiff appeared to be mentally ill and was conducting himself in a manner likely to result in serious harm to himself or others. Defendants thus had probable cause to initially seize plaintiff on January 18, 2013 by directing him to go to WMC for a psychiatric evaluation pursuant to N.Y. Mental Hyg. Law § 9.41.  That Chief Ryan may have had sufficient probable cause to effect a mental health arrest earlier than January 18 does not mean that probable cause was lacking on that date.  As to plaintiff's subsequent seizures at WMC's medical services area between January 18, 2013 and January 23, 2013, and at WMC's Behavioral Health Unit between January 23, 2013 and January 30, 2013, New York Mental Hygiene Law §§ 9.39 and 9.40 permitted defendants to hold plaintiff based on the same concerns that gave the police the authority to bring him to WMC in the first instance, and based on the WMC medical staff's independent determination that plaintiff might have a mental illness that would likely result in serious harm to himself or others if left untreated.  N.Y. Mental Hyg. Law §§ 9.39, 9.40; see Kraft v. City of New York, 696 F. Supp. 2d 403, 415-16 (S.D.N.Y. 2010), aff'd, 441 F. App'x 24 (2d Cir. 2011).

2. <u>Qualified Immunity</u>

Defendants argue that even if plaintiff's seizure was not supported by probable cause, Chief Ryan is nonetheless entitled to qualified immunity.  As discussed above, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson</u>, 555 U.S. at 231 (quotation marks omitted).  "Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."  <u>Escalera v. Lunn</u>, 361 F.3d 737, 743 (2d Cir. 2004).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  <u>Id.</u> (quotation marks omitted).

The Court agrees that Chief Ryan is entitled to qualified immunity in his individual capacity because, in light of the totality of the circumstances and the confluence of concerning information known to him regarding plaintiff's mental health status, it was objectively reasonable for Chief Ryan to believe that probable cause existed.  As discussed above, Chief Ryan directed plaintiff to undertake an evaluation at WMC based on: information that an anonymous friend of plaintiff's had called with concerns about his well-being, plaintiff's bizarre and delusional online communications with Ms. O'Connor, and the knowledge that plaintiff had been stockpiling firearms and was seeking to acquire more.  That information puts

Chief Ryan's conduct well within the boundaries of what is considered objectively reasonable for purposes of qualified immunity under existing case law.  See, e.g., Glass v. Mayas, 984 F.2d 55, 57-58 (2d Cir. 1993); Vallen v. Connelly, No. 99 Civ. 9947(SAS), 2004 WL 555698, at *10 (S.D.N.Y. Mar. 19, 2004).

       3.    Municipal Liability

Defendants further argue that even if probable cause was lacking, the claims against the Town (and against Chief Ryan in his official capacity) should be dismissed because plaintiff fails to allege that any deprivation of a constitutional right resulted from a specific municipal policy, practice or custom or from the actions of a final policymaker for the Town.  The Court agrees.  A § 1983 claim does not arise against a municipality for its employees' constitutional violations under a respondeat superior theory.  Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 691 (1978).  To prevail on a § 1983 claim against a municipality, a plaintiff must show that the alleged deprivation of a constitutional right resulted from a municipal policy, practice or custom, id. at 694, or that a final policymaker of the municipality was personally responsible for the constitutional violation, McMillan v. Monroe Cnty., Ala., 520 U.S. 781, 784-86 (1997).  Under New York law, only the Town Board and the Police Commission have final policymaking over police department matters.  N. Y. Town Law §§ 39, 150; see, e.g., Allen v. City of New York, No. 03 Civ. 2829(KMW)(GWG), 2007 WL 24796, at *19-21 (S.D.N.Y. Jan. 3, 2007); Polite v. Town of Clarkstown, 120 F. Supp. 2d 381, 385 (S.D.N.Y. 2000).  Here, plaintiff does not allege any municipal policy, custom or practice, and does not allege any personal responsibility for any of the conduct at issue by a final

policymaking official for the Town.  The Fourth Amendment claims against the

Town and against Chief Ryan in his official capacity must therefore be dismissed.[17]

C.    Substantive Due Process Claim

"Substantive due process standards are violated only by conduct that is so

outrageously arbitrary as to constitute a gross abuse of governmental authority."

Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999); see Cnty. of

Sacramento v. Lewis, 523 U.S. 833, 846 (1998) ("Our cases dealing with abusive

executive action have repeatedly emphasized that only the most egregious official

conduct can be said to be 'arbitrary in the constitutional sense.'").  "Where a

particular Amendment 'provides an explicit textual source of constitutional

protection' against a particular sort of government behavior, 'that Amendment, not

the more generalized notion of 'substantive due process,' must be the guide for

analyzing these claims.'"  Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting

Graham v. Connor, 490 U.S. 386, 395 (1989)).

Here, plaintiff's substantive due process claim against defendants Dr.

Kemker, WMC, Chief Ryan and the Town is premised on plaintiff's allegations of

involuntary commitment at WMC between January 23, 2013 and January 30, 2013;

it is pleaded alongside (and seemingly in the alternative to) an unlawful seizure

claim arising under the Fourth Amendment.  (Compl. ¶¶ 209-245.)  This claim thus

sounds in the Fourth Amendment, and it is the Fourth Amendment that provides

---

[17] Because the Court concludes that plaintiffs' claims are subject to dismissal on the face of the complaint and plaintiffs' online communications incorporated by reference therein, the Court need not consider whether the hearing officer's § 3020-a decision has preclusive effect as to the Fourth Amendment claims.

an explicit textual source of constitutional protection against the particular sort of behavior at issue.  See Albright, 510 U.S. at 273; see also Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005).  While it is true that substantive due process prohibits states from involuntarily committing a non-dangerous mentally ill individual, a successful claim requires that the commitment decision be based on "'substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community.'"  Bolmer v. Oliveira, 594 F.3d 134, 142 (2d Cir. 2010) (quoting Rodriguez v. City of New York, 72 F.3d 1051, 1063 (2d Cir. 1995)).  Substantive due process, furthermore, is not necessarily violated when a physician's assessment of dangerousness turns out to be incorrect.  Id.  Thus, even if plaintiff's substantive due process claim was not subject to dismissal as duplicative of his Fourth Amendment claim, this claim nonetheless fails because, as set forth above, defendants' actions were privileged and reasonable.  Even accepting plaintiff's allegations as true (and especially when viewing them in conjunction with the record from the state court proceedings), defendants' conduct of involuntarily committing him for a period of one week in light of his recent behavior did not fall substantially below the standards generally accepted in the medical community as a matter of law; their alleged conduct was certainly not so outrageously arbitrary as to constitute a gross abuse of governmental authority.  See Natale, 170 F.3d at 263.

     D.    Second Amendment Claim

     The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In District of Columbia v. Heller, the

Supreme Court held that the Second Amendment "codified a pre-existing right" that includes an "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008).  In McDonald v. Chicago, the Supreme Court held for the first time that the Second Amendment's protections apply fully to the states through the Due Process Clause of the Fourteenth Amendment.  561 U.S. 742, 791 (2010).  While recognizing that the Second Amendment encompasses an individual right, the Supreme Court also made clear that the Second Amendment is not unlimited, and does not protect a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Heller, 554 U.S. at 626.  In particular, Heller rejected the notion that the Second Amendment precludes prohibitions on the possession of firearms by the mentally ill.  Id.  Within this district, courts have also noted that existing case law "indicates that the right to bear arms is not a right to hold some particular gun."  Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 429 (S.D.N.Y. 2013) (citing Garcha v. City of Beacon, 351 F. Supp. 2d 213, 217 (S.D.N.Y. 2005)) (quotation marks omitted).

Plaintiff alleges that "[a]s a direct and proximate result of the defendants' misconduct, [his] legally obtained firearms and his right to legally obtain others has been denied to him unlawfully."  (Compl. ¶ 340.)  That alleged misconduct consisted—most directly —of Chief Ryan arranging with plaintiff's father to retrieve plaintiff's firearms and dispose of them through a licensed firearms dealer, rather than return them to plaintiff (Compl. ¶¶ 133-34), and Chief Ryan reporting to NICS that plaintiff had been involuntarily committed to a psychiatric facility (Compl. ¶

83).  In his prayer for relief, plaintiff seeks an Order directing that "all records that would affect [his] ability to keep and bear arms be expunged and that the legal standing he had before the defendants' misconduct complained of herein to keep and bear arms be restored."  (Compl. at 49.)

The crux of plaintiff's Second Amendment claim, therefore, is not that his constitutional rights were violated when law enforcement seized plaintiff's guns and directed plaintiff's father sell them instead of returning them to him; such a claim might sound in the Fourth Amendment right to be from unlawful seizures, or in the Fifth Amendment right not to be deprived of property without due process of law (although the Court does not believe that the facts alleged state a viable claim under either theory).  Instead, plaintiff's claim is essentially that defendants' actions have prevented him from lawfully acquiring firearms going forward.[18]  The only allegations that could support such a claim are Chief Ryan's reporting of truthful information that the federal and New York State governments require as part of the NICS system, and his actions which contributed to plaintiff's involuntary commitment at WMC in the first instance.  Plaintiff cites no authority for the proposition that truthful reporting may support a plausible Second Amendment claim and, as set forth above, the Court has determined that plaintiff's involuntary commitment was supported by probable cause.  At the very least, in the absence of any precedent, clearly established or otherwise, providing for a Second Amendment

---

[18] The Court notes that, as a factual matter, this appears to be incorrect.  New York law provides that plaintiff may apply for a "Certificate of Relief from Disabilities Relating to Firearms" that under certain circumstances allows those previously under a disqualifying mental disability to possess a firearm.  N.Y. Comp. Codes R. & Regs. tit. 14, § 543.1; see 18 U.S.C. § 922.

claim under these circumstances, Chief Ryan is entitled to qualified immunity, Pearson, 555 U.S. at 231; plaintiff also cannot sustain his claim against the Town because he does not allege a policy, custom or practice of the Town, or any involvement by a final policymaker of the Town, McMillan, 520 U.S. at 784-86.[19]

E.   Section 1983 Conspiracy Claims

Plaintiff alleges two § 1983 conspiracy claims relating to his involuntary commitment at WMC and defendants' alleged retaliation for his speech.  (Compl. ¶¶ 246-52, 300-13.)  "[A]lthough the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right."  Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995).  Thus, to sustain a § 1983 conspiracy claim, a plaintiff must prove an actual violation of his constitutional rights.  Because none of plaintiff's claims alleging an actual violation of his constitutional rights remain against the District, Dr. Hochman, Chief Ryan, or the Town, his conspiracy claims are similarly subject to dismissal.

V.   CONCLUSION[20]

For the reasons set forth above, defendants' motions to dismiss are GRANTED.  Because plaintiff has not sought leave to amend his complaint, and any amendment would nonetheless be futile, the District, Dr. Hochman, Chief

[19] To the extent that plaintiff purports to assert his Second Amendment claim against WMC and Dr. Kemker, his complaint fails to identify any conduct by these defendants that could support such a claim and there is no authority for the proposition that a Second Amendment claim may lie against a non-governmental actor.  Thus, his Second Amendment claim must be dismissed against those defendants as well.

[20] The Court has considered all of plaintiff's remaining arguments and finds them to be without merit.

Ryan, and the Town are dismissed from this action with prejudice.  See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87-88 (2d Cir. 2002). Because there would be no basis to conclude that plaintiff's Second Amendment, Fourth Amendment, and substantive due process conspiracy claims should be treated any differently as to the defendants who did not move to dismiss the complaint, the Court hereby dismisses those claims against those defendants without prejudice.

As a result of the Court's rulings, the only claims remaining in this action are the procedural due process and malpractice claims against WMC (counts five, six, and seven), and the malpractice claim against Dr. Kemker (count six).  As to the parties that remain in this action (i.e. plaintiff, WMC, and Dr. Kemker), the Court will set an Initial Pretrial Conference ("IPTC") in a separate Order.

The Clerk of Court is directed to close the motions at ECF Nos. 32 and 35.

SO ORDERED.

Dated:      New York, New York
            November 17, 2015


_____
            KATHERINE B. FORREST
            United States District Judge